**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| CH LIQUIDATION ASSOCIATION LIQUIDATION TRUST and JOSEPH ORITI, in his capacity as Debtor Representative and Liquidation Trustee,<br><br>Plaintiff,<br><br>v.<br><br>GENESIS HEALTHCARE SYSTEM, MATTHEW PERRY, ROBERT MILLER, BLUE & CO., BRICKER & ECKLER LLP, MICHAEL GIRE, OWENS & MANNING AND MICHAEL MANNING,<br><br>Defendants. | CASE NO: _____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

CH Liquidation Association Liquidation Trust and Joseph Oriti, in his capacity as Debtor Representative and Liquidation Trustee ("Plaintiff") of the estate of Coshocton County Memorial Hospital Association n/k/a CH Liquidation Association ("CCMH" or "Debtor"), by and through its undersigned counsel, for his Complaint against defendants Genesis Healthcare System ("Genesis"), Matthew Perry ("Perry"), Robert Miller ("Miller"), Blue & Co. ("Blue"), Bricker & Eckler LLP ("Bricker"), Michael Gire ("Gire"), Owens & Manning ("O&M") and Michael Manning ("Manning") (collectively, the "Defendants"), avers as follows:

3594448

## NATURE OF THE ACTION

1.     This Complaint seeks redress for the injuries caused by the Defendants to CCMH, its creditors and its charitable mission.

2.     In 2012, in furtherance of its longstanding goal of increasing its market presence in the region and controlling a competitor, Genesis entered into a management services agreement (the "Management Agreement") with CCMH pursuant to which, among other things, Genesis (i) provided the key executive personnel to manage CCMH on a day-to-day basis (including the chief executive office and chief financial officer); (ii) acquired a seat on the CCMH board of directors (the "CCMH Board"), filled by Genesis' CEO; and (iii) was responsible for strategic planning, financial management and physician recruiting.  Rather than act in good faith and with reasonable skill and due diligence in discharging its responsibilities as required by the Management Agreement, Genesis abused its power and ran CCMH for Genesis' own benefit, leaving CCMH saddled with mounting debt from which it could not recover.

3.     The Management Agreement included a number of non-market, overreaching provisions designed to lock-up CCMH for Genesis' benefit, preventing CCMH from affiliating with any other healthcare system or even terminating the Management Agreement for cause.  As a result of Genesis' exercise of its monopoly power and its restraint on trade, CCMH became less competitive in the hospital and hospital related services market in Coshocton County, Ohio, the relevant market (hereinafter referred to as the "Coshocton Market"), diminishing or preventing CCMH from growing its revenues.

4.     Additionally, pursuant to the Management Agreement, Genesis provided CCMH with what was styled as a loan in an amount of $4 million.  Genesis was acutely aware of CCMH's dire financial condition at the time it provided the purported loan and knew CCMH would be unable to repay the $4 million—a required condition for CCMH to terminate the

Management Agreement. The $4 million was thus an investment by Genesis in CCMH for the opportunity to control the market, generate additional revenues and prevent competing hospital systems from affiliating with CCMH.

5.      Each of the other Defendants also had the duty and opportunity to protect CCMH but failed to do so. Perry, Genesis' CEO, served on the board of CCMH, and in that capacity breached his fiduciary duties to CCMH, as he made decisions which benefited Genesis rather than CCMH. Bricker, a law firm, and Gire, a partner at Bricker, simultaneously represented Genesis and CCMH in their dealings with each other relating to, among other things, the Management Agreement and several ancillary agreements. O&M, CCMH's independent legal counsel, and Manning, a partner at O&M, were ineffective, as they acted merely as figurehead counsel and failed to provide any substantive legal advice to CCMH during the course of O&M's representation or advice CCMH of Bricker's conflict of interest. Finally, Blue, CCMH's auditor, was heavily influenced by Genesis—CCMH's competitor—in preparing CCMH's audits, despite Genesis' clear financial stake in the outcome of CCMH's audits. As a result of Genesis' pressure, Blue removed going concern qualifications from CCMH's 2012 and 2013 audits, artificially extending the life of CCMH and causing it to plummet further into insolvency.

6.      In particular, based on CCMH's audited financial statements, as of December 31, 2012, after Genesis became the manager of CCMH, CCMH's accounts payable and accrued expenses equaled approximately $6.6 million. As of December 31, 2015, shortly after the Management Agreement was suspended, CCMH's accounts payable and accrued expenses had increased to approximately $14.4 million. Thus, during the period while Genesis managed CCMH, CCMH's accounts payable and accrued expenses increased by approximately 220% and the CCMH Board designated reserves had been exhausted. Genesis was operating CCMH at a

staggering rate of losses at the expense of CCMH's creditors. During the same period of 2012 – 2015, CCMH experienced cumulative operating losses of approximately $18 million. While CCMH's financial condition materially deteriorated under Genesis' management and CCMH's insolvency deepened, ultimately leading to the bankruptcy filing, Genesis' financial condition either stabilized or improved.

7.      The misconduct of each of the Defendants set forth at length herein, in whole or in part, resulted in CCMH's inability to survive as a standalone hospital or enter into a strategic transaction with another hospital system, deepened CCMH's insolvency, and ultimately led to CCMH filing for chapter 11 protection on June 30, 2016.

8.      Plaintiff further seeks to avoid and recover from Genesis, or from any other person or entity for whose benefit the transfers were made, all preferential transfers of property of CCMH that occurred during the Preference Periods (defined below), as well as all fraudulent transfers of property of CCMH, pursuant to sections 547, 548 and 550 of chapter 5 of title 11 of the United States Code (the "Bankruptcy Code").

9.      In addition, Plaintiff seeks to disallow, pursuant to sections 502(d) of the Bankruptcy Code, any claim that Genesis has filed or asserted against CCMH or that has been scheduled for Genesis. Plaintiff reserves all of its rights and the rights of CCMH and the Debtor Representative to object to any such claim for any reason.

## JURISDICTION

10.      This action arises in and relates to the chapter 11 case of CH Liquidation Association, Case No. 16-51552, now pending in the United States Bankruptcy Court for the Northern District of Ohio (the "Bankruptcy Court").

11.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1334.

12.      This Court also has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331

and 1337 in that this case arises under the laws of the United States and, in particular, acts of Congress protecting trade and commerce against restraints of trade.

13.     Venue of this action is proper pursuant to 28 U.S.C. § 1409 and 28 U.S.C. § 1391(b), including 28 U.S.C. §1391(b)(2) because a substantial portion of the critical acts or omissions giving rise to the claims asserted herein occurred in this District.

14.     Venue is also proper under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, which provides that an action under the antitrust laws may be brought in any district wherein the defendants may be found or transact business.

## PARTIES

15.     CCMH operated a general acute care not-for-profit hospital in Coshocton, Ohio ("Coshocton Hospital" or "Hospital") and had a number of primary care and specialty physician clinics.

16.     Plaintiff Joseph Oriti is the Debtor Representative and Liquidation Trustee under the First Amended Joint Chapter 11 Plan of Liquidation for Coshocton County Memorial Hospital Association n/k/a CH Liquidation Association of the Debtor and the Official Committee of Unsecured Creditors (the "Plan") confirmed by the Bankruptcy Court in the Debtor's chapter 11 case on July 12, 2017.

17.     Genesis is an integrated health care delivery system with an address at 2951 Maple Avenue, Zanesville, Ohio 43701.

18.     Defendant Perry is the President and CEO of Genesis and was a member of the CCMH Board from June 15, 2012 until November 12, 2015.

19.     Upon information and belief, Perry resides in Zanesville, Ohio.

20.     Defendant Miller was the CEO of CCMH during relevant time periods.  Miller was also an employee of Genesis during relevant time periods.

21.     Upon information and belief, Miller resides in Coshocton, Ohio.

22.     Defendant Blue is a professional association of certified public accountants with offices in Indiana, Kentucky, Ohio and Texas.

23.     During time periods relevant to the allegations herein, Blue acted as an auditor for CCMH and provided certain professional services to Genesis.

24.     Defendant Bricker is a law firm with offices in Ohio in the cities of Columbus, Cleveland, Cincinnati, Dayton, Marietta, and Barnesville.

25.     Defendant Gire was, at all relevant times, a partner at Bricker.

26.     Upon information and belief, Gire resides in Ohio.

27.     Defendant O&M is a law firm with an office in Plainfield, Ohio.

28.     Defendant Manning was, at all relevant times, a partner at O&M.

29.     Upon information and belief, Manning resides in Ohio.

## PROCEDURAL HISTORY

30.     On June 30, 2016 (the "Petition Date"), CCMH filed its voluntary petition (the "Petition") under chapter 11 the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Ohio.

31.     CCMH continued to operate its business as debtor-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108 after the Petition Date.

32.     On October 3, 2016, the Bankruptcy Court entered an order approving the Debtor's sale of substantially all of its assets to Prime Healthcare Foundation-Coshocton, LLC and Prime Healthcare Foundation, Inc.

33.     The sale transaction closed on or about October 31, 2016.

34.     On July 12, 2017, the Bankruptcy Court entered an order confirming the Plan.

35.     Joseph Oriti was appointed as the Debtor Representative and Liquidation Trustee

under the Plan, which granted him standing to pursue the cases of action asserted by the Debtor

Representative and Liquidation Trustee in this Complaint.

36.    The Effective Date of the Plan occurred on August 1, 2017.

## FACTS

**A.    FOR MORE THAN A CENTURY, COSHOCTON HOSPITAL SERVED THE HEALTHCARE NEEDS OF PATIENTS IN RURAL OHIO.**

37.    Coshocton Hospital began serving the residents of Ohio more than 100 years ago.

38.    In 1946, CCMH was incorporated in the state of Ohio with the purpose of

establishing a not-for-profit hospital to benefit the general health of the public.

39.    At the time of the filing of the petition, Coshocton Hospital was an independent

community hospital with 56 beds and the only hospital within a 25 mile radius of its location in

eastern central Ohio, providing a vital service to the community.

40.    Following the 2008 recession, CCMH as well as other rural community hospitals,

faced financial difficulties due, in part, to (i) an increase in local unemployment rates that were

some of the highest in the state of Ohio; (ii) increased levels of bad debt from patients failing to

pay their bills due to a rise in the number of patients without insurance or with high deductible

plans; (iii) employers choosing to not provide health insurance to their employees as a cost

cutting measure; and (iv) patients deferring elective procedures due to a lack of adequate

coverage.

41.    It was critical to the success of Coshocton Hospital and fulfillment of its

charitable mission for CCMH to maintain its market share, and to recruit and employ physicians,

and in particular specialists, who could serve the patients in the market as well as attract new

patients to the Hospital.

B.    **GENESIS DEVELOPED A STRATEGIC PLAN TO DOMINATE THE REGION AND CAPTURE MARKET SHARE.**

42.    Genesis is based in Zanesville, Ohio approximately 30 miles south of CCMH.

43.    According to its website, today Genesis is the largest health care provider in the region.  (See http://www.genesishcs.org/about-us/.).

44.    Defendant Perry has been the chief executive officer ("CEO") of Genesis since October 2007 and Paul Masterson ("Masterson") has been the chief financial officer ("CFO") since the formation of Genesis in 1997.

45.    When Perry became CEO in 2007, he was unsatisfied with the size of Genesis' operations and wanted Genesis to compete for recognition on a statewide and nationwide level.

46.    Perry and Masterson developed a strategic plan to capture and control patient market share in the region (the "Genesis Plan"), which was approved by the Genesis board.

47.    Genesis' primary service area ("PSA") (i.e. patient market) included the counties of Coshocton, Muskingum, Morgan, Perry, Noble and Guernsey ("Six-County Region") and its secondary service area included six adjacent counties: Licking, Athens, Washington, Monroe, Belmont, and Tuscarawas.

48.    The initial goals of the Genesis Plan included, among others, to:

(a)    Be the provider of choice for the Six-County Region;

(b)    Target physician recruitment and employment by: (i) increasing the number of physicians employed by Genesis and the number of specialties covered by Genesis-employed physicians; (ii) increase the number of physicians aligned with Genesis and develop a physician integration strategy for a non-employed alignment model for radiology, orthopedic, cardiology, and radiation oncology groups.

(c)    Implement "state-of-the-art" technology & facilities by, among other things, using a "World-Class Electronic Medical Record" system called Epic EMR ("Epic");

(d)    Broaden the reach of Quality Care Partners, a Physician-Hospital

Organization of which Genesis owned 50%, through among other things, developing the Partners Community Health Plan with MedBen;

(e)     Be the employer of choice in the region by (i) offering competitive compensation, and (ii) leadership development;

(f)     Use a clinical integration strategy to capture the PSA of hospitals and health care systems serving the Six-County Region; and

(g)     Encourage health care providers to transfer patients to Genesis instead of other healthcare systems.

49.     Perry and Masterson knew that in order to increase Genesis' PSA in the Six-County Region, Genesis would need to attract patients from other hospitals and health care systems or otherwise cause such patients to use the services provided by Genesis.

50.     The PSA of Coshocton Hospital overlapped with the Six-County Region targeted by Genesis, and Perry and Masterson considered Coshocton Hospital to be a competitor of Genesis for, among other things, market share in the region.

51.     As a result, the Genesis Plan included a strategic initiative to target a relationship with CCMH and Southeast Ohio Regional Medical Center ("SEORMC"), which also had a PSA market that overlapped with Genesis in the Six-County Region.

52.     Genesis also viewed a relationship with CCMH as a way to keep other health care systems out of the region.

53.     By working with CCMH, Genesis could promote itself in CCMH's territory and could encourage CCMH to transfer patients to Genesis instead of to other health care systems.

54.     Genesis engaged the Camden Group, a management consulting and services company, to develop an overall clinical integration contracting strategy in furtherance of the Genesis Plan.

55.     Upon information and belief, Genesis also had a longstanding relationship with the law firm of Defendant Bricker.

56.     Genesis engaged Bricker to provide legal and strategic advice and guidance regarding the Genesis Plan and the implementation thereof.

**C.     GENESIS TARGETED A RELATIONSHIP WITH CCMH THROUGH THE FORMATION OF THE EAST OHIO HOSPITAL ALLIANCE.**

57.     Upon information and belief, in the fall of 2008, Genesis approached CCMH and SEORMC about forming a not-for-profit healthcare alliance.

58.     Thereafter, the East Ohio Hospital Alliance ("EOHA") was incorporated on January 20, 2009 by Bricker.

59.     Perry and Masterson served as Genesis' representatives on the EOHA board.

60.     Miller served as one of the CCMH representatives on the EOHA board.

61.     Bricker was hired to provide legal services and advice to the EOHA.  Bricker prepared the EOHA incorporation documents and the code of regulations, was responsible for storing the EOHA minutes, provided legal advice to the EOHA through primarily Defendant Gire, and drafted EOHA agreements and contracts.

62.     At regular board meetings, each member of the EOHA—Genesis, CCMH, and SEORMC—received one vote on each matter that was put to a vote.

63.     In addition, each member of the EOHA "retain[ed] unfettered discretion and autonomy with respect to its operations."

64.     The EOHA Code of Regulations contained a conflict of interest policy, stating:

> Recognizing that the Directors and the officers have a duty of loyalty and fidelity to the Corporation, and that they must govern the Corporation's affairs honestly and economically exercising their best care, skill and judgment for the benefit of the Corporation, to avoid even the appearance of impropriety, the Directors and the officers shall disclose to the Board any situation wherein the Director or officer has a conflicting interest or duality of interest that could possibly cause that person to act in other than the best interest of the Corporation.  Without limiting generality of the foregoing, the Corporation hereby adopts the Model Conflicts of Interest Procedures developed by the Internal Revenue Service in the form attached hereto as Schedule B to this Code of Regulations as the Conflicts of Interest Procedures of the Corporation.

\*\*\*

Any Director having a known duality of interest or possible conflict of interest on any matter should make disclosure of such conflict to the other Directors.  Such Director should not vote or use his or her personal influence on the matter . . . .

65.     Upon information and belief, Perry and Masterson had conflicts of interest and/or duality of interests in transactions with EOHA and failed to disclose such conflicts to the other Directors and failed to abstain from voting or using their personal influence on such matters.

66.     By February of 2009—less than a month after incorporation of EOHA—an employee of Genesis reported to Perry that a rumor was circulating at CCMH that "Genesis took over" Coshocton Hospital.

**D.     GENESIS WAS UNABLE TO CONVINCE EOHA TO ADOPT ITS HIGH PRIORITY INITIATIVES.**

67.     Perry furthered initiatives that would directly benefit Genesis' interests through the EOHA and upon information and belief, failed to disclose the Genesis Plan or Genesis' other interests in certain transactions that were put before the EOHA board.

68.     Genesis advocated for CCMH and SEORMC to implement the "state-of-the-art" Epic electronic medical record system ("EMR"), but was unsuccessful.

69.     Genesis wanted CCMH to implement Epic because, among other reasons, (i) Genesis would realize cost savings on its own use of Epic if CCMH and SEORMC utilized Epic, (ii) it would further integrate the hospitals into the Genesis system and thereby encourage transfers to Genesis and the utilization of Genesis' services which would increase Genesis' profits, and (iii) CCMH's use of Epic would ensure that rival healthcare systems with their own EMR platforms would be shutout from the region.

70.     In 2011, after a review of the program, CCMH and SEORMC both declined and instead elected to use Meditech for its EMR needs.

71.     As set forth below, it was not until October 31, 2013, when Genesis was in control of CCMH and Perry had a seat on the CCMH Board, that CCMH implemented Epic to the detriment of CCMH and to benefit Genesis.

72.     Genesis also sought to expand its lab services to CCMH and in May 2009, Perry agreed to investigate the relationship between CCMH and its reference lab services provider through the Coshocton Hospital CEO, Greg Nowak,—an EOHA board member.

73.     Again, it was not until December 16, 2014, after the execution of the Management Agreement, that Coshocton Hospital agreed to use Genesis' lab services.

74.     Genesis also advocated for the EOHA to explore clinical integration, a goal of the Genesis Plan.

75.     One area of interest for Genesis was the joint recruitment of physicians between the hospitals.

76.     A representative of CCMH emphasized to Genesis that any recruitment strategy must take into account that the parties are competitors, stating in a February 2010 email to representatives of Genesis and SEORMC, "As we are neighbors we are also competitors, and so we must ensure this is approached in a manner that is beneficial to all involved."

77.     On or around May 31, 2011, the EOHA gave a status report to board representatives from the member hospitals which highlighted that in regards to physician recruitment, there was "not enough to go around" and there was "an alarming recruitment drought."

78.     Again, after the Management Agreement was executed, Genesis controlled physician recruitment at CCMH and made decisions that would benefit Genesis despite the "alarming recruitment drought" including cherry-picking the physicians it desired first for its

own benefit before considering the needs of CCMH.

79. The EOHA continued in operation throughout the term of the Management Agreement and eventually dissolved in 2017 after CCMH filed the Petition.

**E. GENESIS DEVELOPED A PROPOSAL TO ADVANCE THE GENESIS PLAN THROUGH A MANAGEMENT AGREEMENT WITH CCMH.**

80. Early into the EOHA relationship, Genesis had developed plans to expand the Genesis network into CCMH.

81. In 2010, Perry received an email from a Genesis employee who stated that in regard to CCMH, "We had talked tangentially about expanding the network in the past. Is this in the game plan still, and is there interest to expand in those directions." Perry replied, "I think now is a perfect time."

82. On or around May 4, 2012, Masterson and CCMH's CFO at the time Robin Nichols had a conversation, during which Genesis learned that CCMH was facing severe financial difficulties. Upon information and belief, Richard (Rick) Davis, the head of Human Resources at CCMH, also told Genesis about CCMH's financial difficulties.

83. Genesis viewed CCMH's financial difficulties as both an immediate threat to the Genesis Plan and as an opportunity to exert more control over CCMH and its market.

84. During the Genesis Executive Committee meeting on May 18, 2012, "Mr. Perry further explained that between CCMH and Genesis together we capture 45% of the market share of the Coshocton county admissions . . . . This leaves an enormous opportunity for growth in this market. This could also be a huge loss of market share for Genesis, if Coshocton affiliates with a competing healthcare system."

85. Within a week of learning about CCMH's financial condition, Masterson and Perry had outlined a plan that they considered a "win-win" for Genesis.

86.     The initial plan brainstormed by Perry and Masterson included that Genesis would get a seat on CCMH's board, have right of first refusal and the right to exclusively negotiate for any affiliation or service agreements made by CCMH, and provide management services to Coshocton Hospital.  In connection with the agreement, Genesis would fund an operations consultant and guarantee financing to CCMH of up to $5 million.

87.     In Genesis' view, an agreement with CCMH would serve two primary purposes for Genesis: (1) to increase Genesis' market share and (2) to serve as a "barrier[] to market entry."

88.     Masterson believed this approach provided Genesis, "with an opportunity to take advantage of these opportunities, while minimizing our down-side risk."

89.     As opposed to under the EOHA, in which CCMH "retain[ed] unfettered discretion and autonomy with respect to its operations" and had vetoed proposals put forward by Genesis, this plan would allow Genesis to control the decisions of CCMH and would prevent CCMH from exploring any affiliation or service opportunities with anyone other than Genesis.

**F.     MILLER FAILED TO NEGOTIATE THE MANAGEMENT AGREEMENT ON BEHALF OF CCMH IN GOOD FAITH.**

90.     In or around May 2012, Genesis and Defendant Miller, then-CEO of CCMH, began discussing a Genesis proposal for Coshocton Hospital.

91.     CCMH was governed by, among other things, its bylaws and constitution.

92.     As CEO of CCMH, Miller was subject to CCMH's bylaws and constitution, which required that Miller, among other things, (i) supervise all business affairs and ensure that all funds were collected and expended to the best advantage possible; (ii) attend all meetings of the CCMH Board and advise with its committees; and (iii) perform any other duty that may have been necessary in the best interests of the Hospital.

93.     Miller and Perry had served on the EOHA board together.

94.     Perry and Miller came to an agreement that if and when a management agreement was signed between Genesis and CCMH, Genesis would employ Miller as CEO of Coshocton Hospital.

95.     Thereafter, Perry and Miller began negotiating on behalf of Genesis and CCMH, respectively.

96.     On or around May 18, 2012, Perry drafted an outline to share with the Genesis board of the proposal that Genesis would put forward to CCMH (the "May Proposal").  The May Proposal provided that, among other things, CCMH and Genesis would enter into a management agreement pursuant to which Genesis would guarantee a $5 million line of credit for CCMH, Genesis would have the sole right to operate CCMH if it needed to perform under the guaranty, Genesis would have the right to become CCMH's sole member if the parties decided to affiliate, Perry would be assigned a seat on CCMH's board of directors, and Genesis would fund an operational review of CCMH by an independent consulting firm.

97.     The same day as the May Proposal was drafted—May 18, 2012—Perry emailed Miller stating, "My executive committee is supportive of proceeding with the plan we have discussed.  Hope the meeting with your Board Chair went well."  Miller replied that, "My meeting went very well as well. Loo[k] forward working together."  Perry forwarded this conversation to Defendant Gire.

98.     Within a few days, Perry had a meeting scheduled with members of the CCMH Board.

99.     To prepare for the meeting with CCMH, Perry emailed the communications director for Genesis, Marsha Allen, requesting a report showing market share.  In the email,

Perry wrote "I think the story is one of. . . . Lots of business leaving and going somewhere other than CCMH or Genesis."

100.    On or around May 22, 2012, Perry met with Miller, Gire, CCMH Board chair Max Crown, and previous CCMH Board chair Jim Brown to discuss Genesis' proposal of a management contract.

101.    After the meeting, Perry emailed a member of the Genesis Board noting that Jim Brown had asked, "Why would Genesis be interested in helping CCMH?"

102.    Perry further noted that if the CCMH Board gave a positive response to the Genesis Plan, that they would "start developing the Management Contract documents ASAP."

103.    By this time, rumors of a potential relationship between Genesis and CCMH began leaking to the public.  Perry emailed Masterson on May 22, 2012 stating, "the word is starting to leak out.  That's a very bad thing until we can get ahead of this message.  I do believe the odds are in our favor that they will do this with us. . . . please stay mum about all this."

104.    Later on May 22, 2012, Perry met with the full CCMH Board, and the CCMH Board agreed to move forward with developing the management agreement.

105.    Miller kept Perry informed of the internal conversations that were occurring between the CCMH Board regarding the May Proposal.

106.    On May 23, 2012 Miller emailed Perry to tell him that Jason Bradford, secretary/treasurer of the CCMH Board, was questioning Genesis' intentions, stating: "Jason called and has questions about our deal after listening to him ponder the concept for over 45 minutes I suggested we come and meet with you face to face and let you assure him that Genesis is doing this with good intentions."  Perry replied that it was a good idea and "[w]ell worth the time investment."

107.    The same day that Miller emailed Perry regarding Jason Bradford's comments, May 23, 2012, Perry emailed Gire and Miller directing them that he wanted to move forward with Miller's employment contract with Genesis, which would be effective after the management agreement was executed.

108.    Bricker, along with the Genesis Human Resources Department, drafted Miller's employment agreement, which included, among other things, a salary increase.

109.    In addition, under the employment agreement with Genesis, Miller was prohibited from communicating or disclosing any "confidential information" related to Genesis, including but not limited to "employee, patient, and financial information, marketing strategy, methods of operations, business plans, or any other trade secret . . . or this [Employment] Agreement."

110.    At the May 29, 2012 Special Genesis Board of Directors meeting, Perry presented the May Proposal to the Genesis board.  In addition to outlining the May Proposal, Perry informed the board that Miller would owe loyalty to Genesis through his new role as CEO of CCMH while employed by Genesis, stating "**As CEO, Bob is accountable to both CCMH Board of Directors and Genesis Administration.**"  (emphasis added).

111.    Genesis also sought legal advice and counsel from Bricker during the negotiations.

**G.      BRICKER DEVELOPED A RELATIONSHIP OF TRUST WITH CCMH THROUGH ITS REPRESENTATION OF THE EOHA WHICH WAS ABUSED WHEN BRICKER REPRESENTED GENESIS IN NEGOTIATING THE MANAGEMENT AGREEMENT TO WHICH CCMH WAS ALSO A PARTY.**

112.    Bricker was hired by Genesis to represent Genesis' interests in the negotiation and drafting of the Management Agreement.

113.    Bricker had provided legal representation and advice to the EOHA, of which CCMH was a member, and had developed a relationship of trust with CCMH through that

representation.

114.    Bricker's representation of Genesis throughout the negotiation and execution of the Management Agreement abused the relationship of trust between Bricker and CCMH developed while Bricker served as counsel to the EOHA.

115.    Genesis and CCMH were adverse parties during the negotiation and execution of the Management Agreement.

116.    The Management Agreement was substantially related to the issues brought before the EOHA and with which Bricker had provided legal advice to the EOHA and its members, including CCMH.

117.    On or around June 4, 2012, Bricker completed a full draft of the Management Agreement and forwarded the draft to Perry and Miller for review.

118.    In or around the time of the negotiations, Defendant law firm O&M, and specifically Defendant Manning, served as outside counsel to CCMH.

119.    Upon information and belief, Bricker communicated and negotiated directly with Miller about the Management Agreement and did not include O&M in any negotiations or conversations before circulating the draft Management Agreement.

120.    In addition, Bricker negotiated with Miller while it aware that Miller would be employed by Genesis following the execution of the Management Agreement and had provided legal advice to Genesis regarding Miller's employment agreement.

121.    After the Management Agreement was executed, Bricker continued to purport to represent both Genesis and CCMH in the parties' negotiations and dealings with one another.

**H.    PERRY AND GIRE CONVINCED MILLER TO CENSOR INFORMATION SHARED WITH THE CCMH BOARD REGARDING THE POTENTIAL CONSEQUENCES OF THE MANAGEMENT AGREEMENT AND O&M AND MANNING FAILED TO PROVIDE ZEALOUS LEGAL COUNSEL DURING THE NEGOTIATION OF THE MANAGEMENT AGREEMENT.**

122.    In response to the draft Management Agreement circulated on June 4, 2012, Miller sent a list of questions to Gire and Perry asking for their comments before sending the draft Management Agreement to Manning.

123.    One of the questions raised by Miller concerned restricting recruitment as between Genesis and CCMH.

124.    Gire responded that such a recruiting agreement had antitrust implications since Genesis and CCMH were still competitors.

125.    Miller replied and added O&M to the email chain, stating that antitrust provided Gire with a good answer if he was asked about recruitment issues between the hospitals.

126.    After the Management Agreement was executed, Genesis did recruit and employ former employees of CCMH to work for Genesis.

127.    Upon information and belief, O&M and Manning did not provide any advice or comments regarding these recruitment concerns during the negotiation of the Management Agreement.

128.    O&M first received a draft of the Management Agreement on June 5, 2012, approximately six days before it was approved by the CCMH Board.

129.    Manning reviewed the draft Management Agreement and emailed Miller on June 7, 2012 with his comments and questions, which he suggested sharing with the CCMH Board.  Miller then removed Manning from the email chain and forwarded Manning's comments to Gire and Perry asking them to respond to Manning's questions.

130.    Gire provided written responses to the issues highlighted by Manning.

131.    Perry wrote to Miller and Gire stating that Perry did not think it was a good idea to share Manning's comments on the Management Agreement with the CCMH Board because

Perry was concerned about the tone of Manning's comments.

132.    Miller agreed with Perry and decided to only send a separate document consisting of a summary of the Management Agreement prepared by Gire to the CCMH Board for consideration, noting they could decide if they should send Manning's comments at a later date.

133.    The same day that Perry discouraged Miller from sharing Manning's comments with the CCMH Board—Thursday, June 7, 2012—the Genesis SLT Board Meeting minutes included the items:  "Legal counsel for Coshocton . . . need to switch to Bricker" and "Plan to have management agreement signed by Monday."

134.    Upon information and belief, Manning's comments and Gire's responses regarding the Management Agreement were never disclosed to the CCMH Executive Committee before they voted to approve the Management Agreement.

135.    Upon information and belief, Manning failed to fully advise the CCMH Board of his concerns with the Management Agreement.

136.    None of Manning's concerns were addressed in the Management Agreement, as only minor changes were made to the Management Agreement from the version Bricker circulated on June 4, 2012 to the version signed by Masterson on June 15, 2012.

137.    Additionally, Miller, as current CEO of CCMH, should have fully informed the CCMH Board regarding the negotiations and consequences of the Management Agreement to allow the CCMH Board to make decisions in the best interests of CCMH.

138.    A reasonable attorney in Manning's position as counsel for CCMH would have known that Miller had a conflict of interest in representing CCMH in the Management Agreement negotiations when Miller was going to be employed by Genesis following execution and would have bypassed Miller and advised the Board directly regarding the Management

Agreement.

**I.     GENESIS WAS AWARE OF THE EXTENT OF CCMH'S SEVERE FINANCIAL CRISIS BEFORE IT ENTERED INTO THE MANAGEMENT AGREEMENT AND MADE CCMH A PURPORTED LOAN OF $4 MILLION.**

139.    In conjunction with developing and implementing the Genesis Plan, Perry identified $175 million dollars of medical business that Genesis was not capturing in the Six-County Region.

140.    Upon information and belief, in 2012, Genesis had an operating loss of $25.6 million.

141.    Perry identified that there was the potential to lose $50 million dollars if PSA market was not maintained.

142.    During the May 29, 2012 Special Genesis Board of Directors Meeting, Perry explained that Genesis "does a little less than 1000" of the 5000 total admissions per year in Coshocton County and that "[t]here is a large opportunity to grow this market."  Perry further reported that "Mr. Masterson has been in contact with our Bond representatives and has been told that the loss of this market would be more devastating then [sic] working with Coshocton to preserve the market share."

143.    In order to preserve the market share and to prevent the loss of millions of dollars in medical business, Genesis knowingly and voluntarily invested $4 million in CCMH as a strategic business decision to benefit Genesis.

144.    On May 10, 2012, a few days after Masterson's initial conversation with Robin Nichols, outgoing CFO of CCMH, and slightly over one month before the execution of the Management Agreement, Masterson sent Perry his "Coshocton Thoughts" which characterized the situation at Coshocton as an "Immediate Crisis."

145.    Perry was also independently aware of Coshocton's deteriorating financial

condition.

146.    On May 16, 2012—approximately one month before the execution of the Management Agreement—Perry emailed Ed Romito, head of the information technology department at Genesis, and informed him that Coshocton was in severe trouble stating, "I will bring everyone up to date on what is happening at Coshocton. Needless to say the wheels are coming off the bus . . . . ."

147.    As a result, Genesis conducted full diligence related to CCMH's financial situation before it entered into the Management Agreement.

148.    Upon information and belief, Genesis knew CCMH was experiencing financial difficulty.

149.    On June 5 and 6, 2012, Masterson met with Nichols to discuss all aspects of CCMH's financial situation and wrote to Perry, "I talked to Robin . . . this is her last week.  I am spending the entire afternoon tomorrow with her to 'pick her brain' and meet with her Division. She is getting stats, financials etc. together for me for 2012 results so far (FYI they had a total census of 7 on Friday)" to which Perry responded, "Thank you very much for the update and for all your proactive efforts you describe here . . . . . . Right on track."

150.    After the June 6, 2012 meeting between Masterson and Nichols, Masterson emailed Perry stating, "Just leaving CCMH.  Very much a mess" to which Perry replied, "Can't wait to hear the whole bloody story…."

151.    Upon information and belief, Masterson and Perry discussed the "mess" at CCMH including the "whole bloody story."

152.    On July 12, 2012, Perry and Masterson went to CCMH to discuss its financial situation.  Afterwards, Perry wrote to Masterson:

Great job with the Coshocton report tonight. You did a very good job at striking the right tone/balance of telling the truth about the situation and doing it in a way that did not come across as the smarter City cousin to the stupid country cousin. Also, great languaging about the partnership. Perfect balance!

153.    On June 16, 2012, two days before the Management Agreement was signed by CCMH, Masterson emailed Perry again about CCMH's financial condition stating, "I think the hole here is much bigger than 5 bills.  Prob closer to 8 and growing."

154.    With the knowledge that CCMH was in severe financial distress, Genesis directed Bricker to draft the Management Agreement.  Thereafter, Genesis signed the Management Agreement which provided for Genesis to secure up to $5 million in financing for CCMH, including the possibility that Genesis would extend the money directly to CCMH.

155.    The Management Agreement would further the Genesis Plan and allow Genesis to control its competitor.

156.    Despite CCMH's dire financial condition, Genesis agreed to provide CCMH a purported line of credit of up to $5 million, of which CCMH drew down $4 million, as an investment in CCMH for the opportunity to further control the PSA market.

157.    Prior to entering into the Management Agreement, Genesis and Perry knew that CCMH could not provide adequate collateral in exchange for the $4 million.

158.    Therefore, in exchange for its investment, the Management Agreement granted Genesis control over the affiliation or sale of CCMH. *See* Management Agreement ¶ 5.5.

159.    The purported line of credit to be provided by Genesis was "[i]n consideration for the covenants set forth in this Agreement" that were listed in Section 5 of the Management Agreement ("Covenants Regarding the Relationship of the Parties").

160.    The covenants in Section 5 of the Management Agreement included restrictions on CCMH's ability to affiliate with, be sold to, or negotiate with anyone other than Genesis

regarding affiliation or sale of CCMH to/with any hospital, hospital system, or health care company. *See* Management Agreement ¶¶ 5.1, 5.2, 5.3, and 5.4.

161.    In addition, the Management Agreement gave Genesis complete control over the day-to-day operations of Coshocton Hospital, including the right to place its own personnel in key CCMH executive positions and gain a seat on the CCMH Board. *See* Management Agreement, ¶¶ 1.3, 2.1, 3.1.

162.    Regardless of whether CCMH succeeded or failed under Genesis' management, it would be a "win-win" for Genesis in furthering its plan to control and capture the market.

**J.    FINALIZING AND EXECUTING THE MANAGEMENT AGREEMENT WAS HAPHAZARD.**

163.    Genesis and CCMH executed the Management Agreement on June 18, 2012—approximately one month after Perry and Masterson first outlined the plan for managing CCMH.

164.    On June 13, 2012, a press release was issued announcing the signing of the Management Agreement even though the Management Agreement was not yet fully executed.

165.    Initially, on June 15, 2012, Perry signed the Management Agreement on behalf of Genesis, but later that day Masterson signed the Management Agreement instead.

166.    While Genesis was able to quickly secure its presence in Coshocton, blocking out any competing hospitals from doing so, its haste in entering into the Management Agreement meant that many details of the agreement were left up in the air, including, among other things, (i) how Genesis would provide the purported line of credit to CCMH, and (ii) how Genesis would manage CCMH given that the two hospitals were direct competitors of one another.

**K.    MILLER NEGOTIATED THE PURPORTED LOAN DOCUMENTS ON BEHALF OF CCMH WHILE HE WAS EMPLOYED BY GENESIS.**

167.    On July 30, 2012, Genesis decided it would directly provide up to $5 million as a purported line of credit to CCMH, of which CCMH drew down $4 million.

168.     Genesis was aware of CCMH's inadequate capitalization when it made the $4 million advance: (i) Genesis understood CCMH could not repay the $4 million contribution unless CCMH was able to significantly improve its operations and (ii) Genesis understood that CCMH would not have been able to survive without access to the $4 million.

169.     On August 21, 2012, CCMH and Genesis entered into a purported loan agreement, whereby Genesis would provide up to $5 million as a purported line of credit to CCMH (the "Purported Loan").  The Purported Loan was evidenced by a purported note (the "Purported Note," together with the Purported Loan, the "Purported Loan Documents").

170.     Miller and the acting CFO of CCMH, Richard Wood, both now employees of Genesis, negotiated and signed the Purported Loan Documents on behalf of CCMH.

171.     Masterson signed the Purported Loan Documents on behalf of Genesis.

172.     During the negotiation and execution of the Purported Loan Documents, Miller was employed by Genesis.  Miller's employment agreement was drafted before the Management Agreement was executed and the employment agreement became effective on July 29, 2012.

## L.     MANNING RUBBER STAMPED THE PURPORTED LOAN DOCUMENTS PREPARED BY GENESIS' COUNSEL.

173.     Genesis' attorney and bond counsel, Marc Kamer, an attorney with the firm Peck, Shaffer & Williams LLP, drafted the Purported Loan Documents and the board resolution for CCMH to approve the Purported Loan Documents.

174.     Although Manning purported to represent CCMH during the negotiation of the Purported Loan Documents, he failed to actively and adequately represent CCMH's interests.

175.     In response to being sent a draft of the documents from Kamer, Manning summarized his understanding and said, "I do not have any issues with these documents."

176.     Upon information and belief, Manning did not further advise CCMH on the legal

consequences of the language or terms of the Purported Loan Documents nor provide any suggestions, edits, or comments.

177.    Upon information and belief, Manning did not express any concern with Genesis' employees negotiating and binding CCMH to the terms of the Purported Loan Documents.

178.    After the Purported Loan Documents were executed and the $4 million was provided to CCMH, Genesis maintained control over the use of the funds.

**M.    THE RELATIONSHIP CREATED BY THE MANAGEMENT AGREEMENT BETWEEN CCMH AND GENESIS WAS UNTENABLE BECAUSE THE MANAGEMENT AGREEMENT PROVIDED FOR GENESIS TO HAVE EXTENSIVE CONTROL OVER ITS DIRECT COMPETITOR CCMH.**

179.    The Management Agreement states that Genesis was retained "in order to achieve [CCMH's] goals" which were to "improve its operating and financial performance, enhance its quality of patient care, and increase access to health care for the benefit of the community." *See* Management Agreement, Whereas Clauses.

180.    The Management Agreement gave Genesis full authority, power, and control to manage, administer, and operate CCMH, its competitor.

181.    The Management Agreement outlined Genesis' scope of authority as CCMH's "Manager" including that Genesis would have "**full power, authority and responsibility**" for the administration and executive oversight of day-to-day operations of CCMH including but not limited to: (i) executive/operations management; (ii) financial management; (iii) strategic planning; (iv) medical staff administration, relations and development; (v) physician recruitment; (vi) facility management; (vii) human resources (except in regards to responsibilities related to union issues); (viii) supply chain management; and (ix) management and approval of all of CCMH's hospital based physician contracts.  *See* Management Agreement, ¶¶ 1.2, 1.2(b) (emphasis added); *see also* Management Agreement, ¶ Section 3.1 (Genesis' "General Responsibilities" included performing the services described within Genesis' scope of authority

to provide for "the management of the day-to-day business affairs of CCMH.").

182.    Under Section Two of the Management Agreement, Genesis also had the power, and utilized that power, to employ key CCMH management personnel who would report to Genesis, CCMH's competitor, by providing the "Executive Management Group" including employing or engaging the CEO and CFO of CCMH.  *See* Management Agreement, ¶ 2.1.1.

183.    In addition to running the day-to-day operations at the hospital, Genesis was also entitled to appoint one person to sit on its competitor CCMH's Board, with **full voting rights**. *See* Management Agreement, ¶ 4.2.1.

184.    By employing key officers of CCMH and having a seat on the CCMH Board, Genesis had the power to control the flow of information that the CCMH Board received from its officers and could effectively keep the CCMH Board uninformed as to the strategic decisions being made by Genesis for Genesis' benefit.

185.    The Management Agreement also provided that the Executive Management Group for CCMH could work simultaneously for Genesis in other capacities.  *See* Management Agreement, ¶ 2.1.2.

186.    Upon information and belief, to the extent the Executive Management Group served in other capacities on behalf of Genesis while also working at CCMH, CCMH was still responsible for reimbursing Genesis one hundred percent of the salary for the each member of the Executive Management Group.

187.    CCMH was also responsible for paying severance costs and expenses of the Executive Management Group pursuant to the Management Agreement.  *See* Management Agreement, ¶ 2.1.3,

188.    CCMH's responsibility for paying severance costs and expenses of the Executive

Management Group was not prorated based on the percentage of time that each member of the Executive Management Group may have been serving in other capacities on behalf of Genesis.

189.    The Management Agreement gave Genesis additional control over those personnel that were not employed by Genesis stating, "Manager has the authority to direct the hire and discharge of CCMH personnel." *See* Management Agreement, ¶ 2.2.

190.    In addition to operational control, Genesis also had control over the financial decisions of CCMH, including preparation of CCMH's annual budgets and cash flow projections. *See* Management Agreement, ¶ 3.2.

191.    Even though Genesis made the financial decisions, CCMH was responsible for all costs and expenses Genesis incurred in operating CCMH and was required to reimburse Genesis upon request, with interest accruing on late payments per month until payments were made in full. *See* Management Agreement, ¶¶ 4.1.1, 4.1.3, 4.1.4 (emphasis added).

192.    In discharging its duties as Manager, Genesis was required to "act in good faith and with reasonable skill and due diligence" including ensuring "at all times that CCMH [was] administered, managed and operated on a fiscally prudent basis", that CCMH "maintain[ed] and enhance[d] a medical staff qualified to meet patient needs", and followed all CCMH policies and bylaws. *See* Management Agreement, ¶ 1.3.

193.    Even with complete control over the operations at CCMH, Genesis failed to achieve the stated purposes of the Management Agreement and failed to discharge its duties in good faith and with reasonable skill and diligence.

194.    Under Perry's leadership, Genesis viewed and treated CCMH as a competitor throughout the life of the Management Agreement and Perry encouraged Genesis to continue to compete with CCMH despite the duties owed to CCMH.

195.    In 2013, Perry instructed Genesis employees that Genesis needed to capture the market stating, "**any patient** in our six county and secondary draw area is **our patient** if they need care that we provide.  I know that might sound preachy but we need to break some of these historical patterns if we are going to change our market share.  And that is not an option as **the only way we survive is to gain market share**." (emphasis added).

196.    On June 20, 2013, Perry sent an email to a Genesis employee, stating, "I looked through this and [have] a couple questions.  The biggest one is: does it make any sense that CCMH is ou[r] biggest competitor when it comes to where [a certain doctor] sends his patients?  There are a couple others that fall [into] the same category."

197.    A 2014 Genesis HealthCare System presentation entitled "Outlook for the Future" stated, "CCMH Board in conjunction with Genesis reviewing multiple options for continued viability[.]  **All options would provide Genesis the ability to continue to be a market leader in Coshocton County**." (emphasis added).

198.    In or around September 2014, Perry drafted an integration plan for CCMH and Genesis, which stated that a base assumption of any plan is that Genesis and CCMH, "Must choose a Corporate/legal model that allows us to operate under common control so we are no longer competitors."

199.    In Standard & Poor's rating of Genesis dated March 12, 2015, it stated that, "Genesis management reports no immediate plans to invest any further in CCMH, but continues to view the market as strategically important to Genesis."

200.    Genesis continued to pursue the objectives of the Genesis Plan throughout the life of the Management Agreement and compete with CCMH, which was irreconcilable with Genesis' duties and obligations under the Management Agreement.

201.    Certain provisions of the Management Agreement were necessarily unworkable given that Genesis was CCMH's direct competitor and that Perry, Genesis' CEO, sat on the CCMH Board.

202.    Section 3.3.4 of the Management Agreements provided, in relevant part, that "[t]he Services shall exclude managed care contracting . . . CCMH employees responsible for managed care contracting shall report to the Executive Management Group (and the Executive Management Group may in turn report managed care contract information and status to the unconflicted CCMH Board members), **provided CCMH Board and Manager both put in place a process to ensure that no managed care contract information or critical terms are shared by the Executive Management Group with Manager**[.]"    *See* Management Agreement, ¶ 3.3.4 (emphasis supplied).

203.    Neither Genesis nor the CCMH Board put any such process in place nor would it have been possible to do so because the Executive Management Group was employed by Genesis.

204.    Additionally, section 6.1 of the Management Agreement provided that "[e]ach Party agrees that it shall not . . . use for its own benefit . . . any confidential or proprietary data, reports, or other information or materials concerning the other Party hereto[.]" *See* Management Agreement, ¶ 6.1.

205.    Perry disregarded his obligation to keep CCMH's proprietary information confidential.

206.    Upon information and belief, Perry used CCMH's confidential information for Genesis' benefit and to further the Genesis Plan.

N.    **PERRY CHOSE TO SERVE ON THE CCMH BOARD DESPITE THE INHERENT CONFLICT OF INTEREST.**

207.    Recognizing that Genesis and CCMH were competitors and encouraging Genesis to continue pursuing initiatives that were contrary to the best interests of CCMH, Perry elected to serve as both the CEO of Manager/competitor Genesis while at the same time serving as a voting member of the CCMH Board.

208.    Under the Management Agreement CCMH was required to "appoint one (1) person of Manager's designation to serve on the CCMH Board with full voting authority for all times during this Agreement." *See* Management Agreement, ¶ 4.2.1.

209.    Paragraph 4.2.1 of the Management Agreement did not require Genesis to designate Perry, or any other Genesis employee, to serve on the CCMH Board.

210.    Under the Management Agreement, the CCMH Board had certain responsibilities that should have served as a check on Genesis' power but failed to do so as a result of Perry's influence and Genesis' control of information flowing to the CCMH Board through the Genesis-employed CEO and CFO of CCMH.

211.    The Management Agreement provided that, "CCMH, through CCMH's Board of Trustees ("CCMH Board"), shall exercise, throughout the term of this Agreement, such authority, supervision, direction, and control over the business, policies, operation, and assets of CCMH as is customarily exercised by a board of directors (Trustees) of an Ohio nonprofit corporation, and shall retain the authority and responsibility regarding such powers, duties, and responsibilities vested in CCMH by applicable law and regulations." *See* Management Agreement, ¶ 1.4.

212.    In addition, CCMH Board approval was required for certain purchases of capital assets or the entry into certain leases or contracts. *See* Management Agreement, ¶¶ 3.3.1, 3.3.2,

and 3.3.3.

213.     Upon information and belief, Perry selected himself on behalf of Genesis to serve on the CCMH Board in order to, among other reasons, (i) influence the CCMH Board to vote in favor of initiatives that benefitted Genesis and/or the Genesis Plan and vote against those that did not further those purposes; and (ii) have access to CCMH's confidential information and decision-making strategy sessions.

214.     Instead of making decisions that were in the best interests of CCMH and preparing it to survive as a standalone hospital or affiliate with another hospital system, Genesis and Perry made decisions for Genesis' benefit, including among others, decisions related to physician recruitment, financial decisions, decisions regarding which initiatives to implement, and decisions that would integrate Genesis and CCMH such that CCMH could not survive without services provided by Genesis.

215.     Upon information and belief, Perry failed to inform the CCMH Board when he or Genesis had an interest in a transaction before the CCMH Board and failed to abstain from voting for actions in which Genesis had an interest.

216.     Upon information and belief, the only decisions that Genesis made that benefitted CCMH were those that were compatible with the Genesis Plan and/or with Genesis' own business objectives.

217.     Upon information and belief, Perry never disclosed the Genesis Plan to the CCMH Board.

218.     The Genesis Plan and the goals of the Management Agreement were irreconcilable, and it was impossible for Genesis and Perry to uphold their duties to CCMH while being a competitor of CCMH and/or pursing the Genesis Plan.

**O.**   **GENESIS LED CCMH TO BELIEVE THAT AN AFFILIATION WITH GENESIS WAS IMMINENT, WHICH GENESIS FAILED TO PURSUE WHEN IT NO LONGER SUITED GENESIS' NEEDS.**

219.   Genesis caused CCMH to believe that the two hospital systems would affiliate, leading CCMH to make certain decisions that it would not otherwise have made if it knew it would ultimately be required to survive as a standalone hospital or put itself in the best position to enter into a strategic transaction with another hospital system.

220.   When affiliation no longer benefited Genesis, Genesis abandoned its affiliation plan, with no regard for the dependent position in which it was leaving CCMH.

221.   In a conversation between Genesis employees and Perry it was stated, "Genesis Coshocton. . . the market is seeing us this way even if we don't :-)."

222.   As a result of its affiliation considerations, Genesis inserted itself into CCMH's physician hiring decisions and counseled CCMH away from decisions that were not optimal for Genesis.

223.   On March 23, 2015, Perry sent an email explaining that "CCMH is actively recruiting for a [certain medical specialist].  I know we have been interviewing candidates as well . . . . What I am concerned about is them finding and hiring [a specialist] who would not meet our standards but would give CCMH an upgrade from [their current specialist.]  If that happened it would likely be difficult for us to integrate this Phy with our program."

224.   Perry later emailed Genesis' chief physician network officer, stating that he would "suggest that we follow this candidate . . . and make sure we participate in the interview process. If he is [a certain specialist] we will need to integrate his practice at CCMH with our group here so that he can do his procedures in Z'ville.  If we 'jointly' recruit him (even if CCMH picks up all the expense of him) we will be able to make sure we don't end up with another Dr. [] situation (a mismatch between CCMH expectations/operations and how he fits with our group

here)."

225.    When Genesis chose not to affiliate with CCMH, CCMH was therefore left in a worse position, as Genesis had left it in a position where it could not survive as a standalone hospital and was no longer as attractive to strategic purchasers.

**P.    GENESIS, UNDER PERRY'S LEADERSHIP, RECRUITED, HIRED, AND EMPLOYED PHYSICIANS FOR GENESIS TO THE DETRIMENT OF CCMH.**

226.    The Management Agreement required Genesis, as CCMH's manager, to staff CCMH with qualified medical personnel.  *See* Management Agreement, ¶¶ 1.3, 1.3(e).

227.    The Management Agreement therefore gave Genesis total control over physician recruitment at CCMH.  *See* Management Agreement, ¶¶ 1.2, 1.2(b)(v).

228.    Despite its contractual obligations and fiduciary responsibilities, Genesis made hiring and recruitment decisions at CCMH for Genesis' own benefit to advance the Genesis Plan.

229.    As Genesis had complete hiring power at CCMH while the Management Agreement was in effect, CCMH was precluded from working with its own recruitment team to hire physicians at CCMH, even when CCMH urgently needed such positions filled.

230.    CCMH was precluded from hiring its own recruitment coordinator and all recruitment through some time in 2015 was filtered through Genesis' recruitment procedures.

231.    Through some time in 2015, Genesis was the "gatekeeper" for CCMH physician recruitment and that process was designed to benefit Genesis to the detriment of CCMH.

232.    CCMH's inability to hire its own doctors was problematic given that CCMH and Genesis were competitors.

233.    Genesis pursued physician candidates first, and only placed candidates at CCMH if they were not suitable for Genesis.

234.    In October 2014, Perry identified that CCMH "need[ed] a new General Surgeon

in the worst sort of way . . ." but ultimately pursued a general surgeon candidate for Genesis instead of CCMH, stating, "We would love to pick up the [s]urgeon who is available now (if she's good of course)."

235.   In order to entice physicians to work at Genesis rather than CCMH, Genesis offered higher salaries to potential candidates.

236.   In 2015, a Genesis doctor expressed concern that Genesis would not be able to compete with certain of CCMH's salary rates, stating "the recruiting fliers going out . . . these rates may pose a problem for us, if we try to keep some of those people, we had not figured such a high compensation rate which is higher than we pay here; how do these compensation rates impact our pro forma?   [H]ow much is Coshocton subsidizing this now and in the future management/directorship there, who what when and how much?"  Perry responded to this email by writing, "this is a temporary situation."

237.   The Genesis doctor sent another email to Perry, stating "FYI what EMCARE is paying for Coshocton boarded and nonboarded.  [T]his is what we will have to compete with for recruiting!  [L]ooks attractive to me!"

238.   Genesis also controlled the movement of doctors between CCMH and Genesis.

239.   In regards to a physician who wanted to work at CCMH fulltime instead of Genesis, Genesis' Chief Compliance Officer wrote to Perry, that "[a]lthough he is a superior [specialty doctor] and would do a fabulous job taking care of patients in Coshocton, this would be a step backwards for [the specialty] program in Zanesville" to which Perry replied, "I really do question the wisdom of enabling [the physician] to consider going to CCMH . . . I don't mean to be negative here, just realistic.  Maybe a way of resolving this with him is to let him know that given the needs of CCMH there is no way he could earn any where [sic] near his current income

if he went there."

Q.    **GENESIS ABUSED ITS POSITION TO STEAL CCMH PHYSICIANS AND STAFF.**

240.    Genesis also poached CCMH physicians and staff that would advance Genesis' own programs.

241.    In 2014, Genesis was in need of a surgeon who performed a specific procedure and identified and secured a surgeon who was employed by CCMH and performed that specific procedure by employing the surgeon with Genesis instead.

242.    In July 2014, Perry asked Lorri Wildi ("Wildi"), CEO of CCMH, if CCMH had a surgeon that performed the specific procedure and Wildi confirmed that CCMH did employ a certain surgeon that performed the procedure.

243.    Two weeks later, Perry emailed a team at Genesis stating "we will be exploring multiple options with [the CCMH surgeon who performs the procedure].  For example, to our knowledge when [a certain Genesis surgeon] retires at the end of this year we will have no surgeon in town who performs [the specific procedure].  This has been the domain of [a specific department] here and with Dr. [] retiring and Dr. [] no longer on staff and Dr. [] does not do this surgery (he can do this surgery but it is a poor use of his time) we are stuck.  **[The CCMH surgeon] . . . does this surgery and we really need to have this capability (can you imagine sending [this specific surgery] out of town?  No way….)  More to come.**"  (emphasis added).

244.    Perry convinced Wildi that [the CCMH surgeon] was not a good fit for CCMH and was lacking in productivity relative to his compensation.

245.    On August 12, 2014, Perry emailed Wildi, "I am certainly willing for us to rethink how and where [the CCMH surgeon] focuses his time.  One option could be to set him up as a full time [] surgeon at Genesis."

246.    As a result, [the CCMH surgeon] became employed with Genesis and continues

to be a Genesis employee today.

R.     **GENESIS USED ITS CONTROL TO KEEP COMPETING HEALTHCARE SYSTEMS OUT OF THE MARKET.**

247.     In addition to supplementing Genesis staff, Genesis also viewed physician recruitment at CCMH as a means to maintain its presence in Coshocton and to keep competing health care systems out of the market.

248.     In the summer of 2012, Genesis learned that a competing health care system of Genesis was planning on working with CCMH to have a specific specialty presence in CCMH three times per week, with Perry calling it an "urgent development."

249.     Perry devised a plan to keep the competitor out of CCMH regardless of the impact on CCMH's patients in the interim and CCMH long term success, stating "[o]ur job is very clear: we need to conceive and execute a plan to place a full time [specialist] in Coshocton ASAP or this market will be taken from us."

250.     Perry described his ultimate plan for this specialty at CCMH, by stating, "What I would like to be able to do is get to full time coverage [at CCMH] and at the same time require an exclusive contract with [Genesis] for the provision of [specialty] Services at CCMH."

251.     Perry took, among others, the following steps to ensure that Genesis would maintain its [specialty] presence at CCMH:

(a)     On August 7, 2012, Perry emailed Miller pitching a program to CCMH that would allow the specialty practice to "grow and improve" stating, "We know that to get from where CCMH is today in the [specialty] space to where they can go we need to clearly define what the 'there' looks like and work backwards on what we need to change to get there."

(b)     On August 8, 2012 and August 9, 2012, Perry had internal conversations at Genesis that proposed sending a Genesis specialist to CCMH three days a week. Genesis' Chief Operating Officer responded, "Using [the Genesis specialist] at Coshocton is a great way to kick off short term . . . [Miller] is concerned that if we open up a new program there, there is no interruptions in coverage (when [the Genesis specialist] leaves for Florida

come winter).”

(c)  Miller was concerned that this would be a short term fix to CCMH's issues but failed to follow through on his concerns.  Perry wrote to a Genesis group, that “Bob [Miller] appropriately told [competitor] that if this had been 6 months ago he would have jumped at the offer but given the new relationship with Genesis he would have to talk this over with us and need to consider the situation in the broader relationship with Genesis.”

(d)  In January 2013, Masterson emailed a Genesis employee stating, “I am concerned if we are losing market in our #1 service” with the employee responding, “We really need [this specialty] in Coshocton to secure those volumes.”  Perry then wrote that “Dr. [] would be a huge get for us in capturing the Coshocton market.”

(e)  In November 2013, Perry emailed Miller asking if Miller was available to catch up regarding the development of CCMH's specialty program.  Perry stated “[w]e've got some great opportunity to really kick this into high gear and I wanted to talk about some ideas about how to structure this Service Line at CCMH.”

(f)  Perry also urged Wildi to meet with Genesis specialists who Perry suggested may be interested in performing services at CCMH.  However, these meetings were futile as none of the specialists put forth by Perry had an interest in working at CCMH.

252.    In 2015, CCMH still did not have full-time specialist coverage and Perry promised the CCMH Board that in his capacity as Genesis CEO he would secure CCMH specialist coverage five days a week.  Perry failed to deliver on this promise.

253.    Genesis was also concerned with CCMH looking beyond Genesis for the provision of another specialist service at CCMH.

254.    On July 23, 2014, Perry sent an email asking “if there is any way of us [Genesis] providing [certain specialty] services at CCMH . . . . The thing I am concerned about is if we don't provide the Phy resources to accomplish this Lorri will be required to seek that from other sources (which obviously would be bad for us in total).”

255.    In Spring 2015, it became clear to CCMH CEO Wildi that the joint recruitment of

physicians between Genesis and CCMH was not working and that Genesis was running the recruitment process in a way that would not lead to improvements in CCMH's operational and financial condition.

256.    Thereafter, Wildi urged Perry to let CCMH hire one or more physician recruitment search firms but Perry denied this request.

257.    Wildi disregarded the denial and decided to retain a physician recruitment search firm to recruit for CCMH.

258.    Perry was displeased with this decision and described Wildi as insubordinate.

259.    CCMH hired three surgeons, one specialty doctor, one general practitioner and one nurse practitioner within five months of using its own recruitment firm.

260.    Although physician recruitment improved, by this point CCMH was already saddled with debt and it was unable to recover from Genesis' previous managerial decisions, including recruitment and financial decisions.

**S.    GENESIS MANAGED CCMH TO INCREASE REFERRALS AND TRANSFERS TO ITS COMPETITOR GENESIS.**

261.    In addition to failing to recruit and retain physicians to serve CCMH's needs, Genesis made decisions for CCMH that would increase Genesis' profits regardless of its impact on CCMH or its patients.

262.    The Management Agreement provided that, "[n]othing in this Agreement shall require either Party to arrange for or send patients to the other Party or to the other Party's affiliated providers." *See* Management Agreement, ¶ 9.12.

263.    Genesis sought to increase its market share and to profit from CCMH by expecting and encouraging referrals and transfers to Genesis.

264.    In May 2013, Perry emailed a Genesis physician stating, "you mentioned that

there is a list of physicians who you get zero referrals from [from CCMH] and it appears they are doing this intentionally.  Would you mind sending me a list?"  The physician sent Perry the list, to which Perry replied "I really believe that if we put together a very **intentional plan of attack** [for the Coshocton Market] and then execute it, we could really turn the majority of the phs on this list toward you.  As for [CCMH], **this is a market that is just ripe for invading and capturing**." (emphasis added).

265.    Perry planned and directed that Genesis would pay for a dinner reception that would introduce Genesis specialists to physicians at CCMH with the goal of encouraging CCMH to send patients to Genesis, stating, "We could also take the approach of 'introducing these phys as new partners of each other.'  We are creating one, jointly operated Phy network and this is a great way for them to get to know and start supporting one another . . . . Obviously, Genesis will pay for the event."

266.    Upon information and belief, CCMH physicians were asked about their referral practices at the reception by employees of Genesis.

267.    After the reception, Genesis employees noted that physicians were "uncomfortable with the conversation."

268.    A major initiative of the Genesis "intentional plan of attack" for increasing referrals to Genesis and further capturing the PSA market was targeting CCMH's emergency department ("ED").

269.    Perry wrote, "We all know the ED is any Hospitals front door."

270.    In July 2013, Perry emailed the Genesis team stating, "CCMH ED currently sends a large amount of their transfers they can not [sic] care for locally to Hospitals other than Genesis for services we provide every day. This represents significant loss of market for Genesis

. . ." continuing,

> Recommendation: That we develop a process, in partnership with CCMH, to become their "go to" referral center for support of their ED. I have a preconceived solution for how to do this (you know how valuable that might be.....). Why could we not set up a "direct ED to ED transfer" process where they have a "bat phone" that connects them directly to our ED where we could do a direct hand off so we bypass the push back story of "I don't want to accept a patient of CCMH's so I decline the transfer" response. The reason I think some variation of this could work is that done ED to ED **these patients are our patients not CCMH's patients.** Now I know we will need to communicate however we set this up to the Medical Staff here. My point to any push back would be how is it any different that at patient from Coshocton county decided to go their local ED vs that same patient who made a different choice to drive to our ED..... **In other words any patient in our six county and secondary draw area is our patient if they need care that we provide.** I know that might sound preachy but **we need to break some of these historical patterns if we are going to change our market share. And that is not an option as the only way we survive is to gain market share.**

> I would ask that you guys have a discussion about my proposal and come up with the best way you think we should go about this on our end. I will then circle Bob Miller, [and certain others] into the discussion for how to work with them on this. (Emphasis added.)

271.    In response to comments regarding his "bat phone" plan, Perry stated:

> I agree we don't want to have patients brought here by ambulance only to be sent on because the service they need is not something we are capable of providing. I like your description of our ED docs will be "triaging" all patients that the Coshocton ED decides to transfer. In effect, if we set this up correctly, it could work as if the CCMH ED is an extension of our ED and visa versa.

> ***

> I know this is going to take an intentionally designed communication process between the ED phys at CCMH and the ED phys here but I know it can work. At the last system I worked at my 4 hospitals EDs were "connected" to the mother ship ED via a "Bat phone". When a patient presented to one of the 4 EDs they could not care for, the Bat phone connected the two ED Drs directly and it made for a very smooth transfer process. If, on the rarer occasions that it was a patient that the mother ship could not handle they facilitated the arrangements for other ED. This was all handled through a well crafted Transfer Agreement that identified the mother ship Hospital as the "go to" place for all the other hospitals. This was well know and communicated in the communities of the 4 Hospitals. It made the process for the referring hospital very easy and smooth. It also served as a great communication process for the mother ship hospital to work with it's

medical staff on the understanding that "their patients are our patients".... Was this perfect? no, nothing is, but it created the expectations of how the hospitals are going to take care of patients together.  If there were "sticking points" in the this process at any time there was an escalation process so Medical Directors and Administrators on call were pulled in, real time, when the inevitable "issues" arose.  When we create this same process between CCMH and Genesis I believe we could go out the entire community of Coshocton with a big media release on how the two hospitals have created a system where, in essence, Genesis has projected the full capabilities of our Hospital into the ED of CCMH and when patients need care beyond what CCMH can provide that the transition between care settings will be seamless.  I know that Coshocton will fully embrace this concept as they look at Genesis being more active in their Hospital as a way of improving their brand.  I know for a fact that Max, their Board Chair, would fully endorse this kind of idea.  I could also see us utilizing the telemedicine link for visualization, etc.. Let's make this happen...

272.   Perry had a clear vision that Genesis would become CCMH's primary transfer center.  This continued beyond 2013.  On January 12, 2015, Perry emailed a group at Genesis stating that "[c]reating a seamless consult and referral process [with CCMH] can generate enormous benefits for both CCMH and Genesis.  The goal is to develop a very robust and predictable mutual support process . . . . In short the initial ideas has a couple components:  1) Have a team from Genesis participate in the orientation of the new ED Phys at CCMH to present the 'clinical programs' we offer at Genesis; 2) create a dialogue about what they see as their needs from a Regional Referral Center support system; 3) describe the Specialist system we have available and how our transfer system works; 4) articulate how an ED to ED transfer process can work; etc…"

273.   On March 11, 2015, Perry emailed a Genesis doctor stating that:

One of the important things that I discussed with Lorri Wildi (CEO) and Stephanie Conn (CNO) the other week that we can help them with now is the referral process for transferring patients from CCMH to Genesis and making that as easy as possible for the EMCare Phys.  What they very candidly told me was that the transfer line was not working efficiently enough for them.  The EMCare phys described the process taking too long and they get push back from some of our Phys, etc.... Frankly, they are finding it much easier to just call Columbus, who "always just say yes".  What I suggested to Lorri and Stephanie was a process, that you had mentioned to me some time ago, ie. just do an ED to ED

direct transfer.  Both Lorri and Stephanie felt that a process that worked like that would be received very well by the EMCare Docs but that time is of the essence to get that established before the EMCare Docs got their routine referral patterns established.  So, they were very supportive of arranging a meeting between the EMCare Medical Director and some of their Docs and a team from Genesis (likely you, Dave, our trauma coordinator, etc...).  The goal of this face to face meeting would be to establish a relationship, set up the transfer protocol and work out any other operational issues to enable us to support them in a way that we earn their referrals.  I know we can make this very easy for them and could provide them expertise and support that will help them succeed at CCMH.  Everyone can win here.....”

274.    Perry's “bat phone” plan disregarded the specific needs of CCMH's patients including those circumstances where a transfer to Genesis was not the best course of action.

275.    Regardless of its impact on the patients or on CCMH, Perry continued to press CCMH to send all transfers to Genesis.

276.    In 2014, Genesis seemed to be achieving its goal stating “the transfer relationship seem[ed] to be going very well.”

277.    In a presentation Genesis sent to Moody's on March 17, 2014, titled “2013 A Year in Review – Investor's Meeting,” the “Outlook” slide stated that a reason for growth for Genesis is “stream-lined Transfer Process with Coshocton Hospital.”

278.    In September 2014, Perry stated to Stephanie Conn, an employee that worked for both CCMH and Genesis, that transfers out of CCMH should go to Genesis and that CCMH's transfer tracking service provider should defend “every transfer [out of CCMH] that is appropriate that doesn't go to Genesis.”  Ms. Conn reported that CCMH “also monitor[s] the transfer rates to Genesis versus other facilities and those rates have also improved.  Approximately 50% of our transfers out are to Genesis which is up 20% from 2013.”  Perry replied stating that “I know this is obvious but the more patients are kept at CCMH every day (**and the appropriate transfers out coming to Genesis**) to [sic] more revenue you guys generate.”  (emphasis added).

279.    Genesis, through Perry's leadership, continued to use its influence as manager to try to create the easiest path for transfers and referrals between CCMH and Genesis.

280.    When the relationship between CCMH and Genesis began to deteriorate, but while Genesis was still CCMH's manager, Genesis shifted its plans to bypass CCMH in order to directly target CCMH's patients.

**T.    GENESIS WORKED WITH QUALITY CARE PARTNERS TO DEVELOP A HEALTHCARE PLAN FOR CCMH EMPLOYEES THAT WOULD BENEFIT GENESIS AND PRIORITIZED PAYMENTS OF CCMH HEALTHCARE CLAIMS OWED TO GENESIS.**

281.    One of the original goals of the Genesis Plan was to broaden the reach of Quality Care Partners, a Physician-Hospital Organization of which Genesis owned 50%, through, among other things, developing the Partners Community Health Plan with MedBen.

282.    In furtherance of this goal, Genesis developed a healthcare plan for CCMH employees that required CCMH to work with Genesis' partner, MedBen, as its third party administrator ("TPA") and use Quality Care Partners ("QCP"), of which Genesis owned 50 percent, to manage CCMH's healthcare plan.

283.    Prior to execution of the Management Agreement, CCMH used MedBen as the TPA of Medical Mutual of Ohio ("MMO"), CCMH's medical network provider.

284.    However, based on information and belief, MMO's TPA policy changed, and MMO no longer allowed certain employers, including hospitals, to use TPAs, such as MedBen, to lease MMO's network.  Pursuant to the policy change, MMO now required those employers use the MMO TPA if they wanted to continue to use the MMO network.

285.    To ensure CCMH continued to use MedBen, Genesis developed a plan under which CCMH would switch its medical network from MMO to Ohio PPO Connect, Genesis' medical network.

286.    CCMH would then use QCP as an EPO and CCMH employees would only be

able to leave the QCP network when QCP referred them out of network.

287.    On August 21, 2012, a QCP employee emailed Perry discussing the arrangement whereby CCMH would switch to Ohio PPO Connect stating, "[u]nder this scenario, service would be directed to Genesis for those things that cannot be done in Coshocton."

288.    On August 23, 2012, the QCP employee emailed Perry again stating "[w]e need to direct the care they cannot do in Coshocton within QCP and QCP will need to be the UR Firm[,]" to which Perry replied "[a]bsolutely what I was thinking . . .  Right now they have a plan design that incentivizes their covered lives to seek care at CCMH (for the scope of services they provide). **However, after that they have no steerage to Genesis so a very large number of their staff go to Columbus for their care** . . . We really need to help them recreate their health benefit design, using the QCP network, Case management and UR processes to manage their care."  (emphasis added).

289.    That same day, the QCP employee emailed Perry that he could move quickly in establishing the new benefit design.  Perry wrote back, stating "Very good.  I know we can help them **(and us)** with a redesign of their plan design."  (emphasis added).

290.    Genesis also prioritized payments of CCMH healthcare claims owed to Genesis.

291.    Under CCMH's self-funded healthcare plan, CCMH was responsible for paying the covered portion of the healthcare claims of its employees.

292.    Under Genesis' management, CCMH continued to fall behind in paying its employees' healthcare claims.

293.    Genesis closely monitored this situation with respect to the outstanding amounts CCMH owed Genesis for CCMH's employees' healthcare claims.

294.    Genesis then pressured CCMH to pay the outstanding amounts owed to Genesis

before paying any other healthcare claims.

295.    On December 6, 2013, Scott Silvestri ("Silvestri"), CFO of CCMH, emailed Masterson, stating that "Rick and I are meeting with med ben on the 17th to try again with getting Genesis paid first."

296.    Similarly, on January 29, 2014, Silvestri emailed Masterson, stating "[g]oing to use 600k to pay benefits.  Going to instruction [sic] Medben to pay Genesis first."

**U.    GENESIS IMPROPERLY WORKED TO HAVE THE GOING CONCERN QUALIFICATION LANGUAGE REMOVED FROM CCMH'S AUDITS IN ORDER TO PREVENT SERIOUS NEGATIVE IMPLICATIONS TO GENESIS' AUDITS.**

297.    In February 2013, Genesis' auditors, PlantMoran, asked Perry questions about CCMH's ability to pay back the Genesis financing.

298.    Perry emailed Miller and Masterson, among others, that, "[t]he position [PlantMoran is] working to get comfortable with is that, yes, CCMH will be able to pay us back over time.  **As you can guess this is a very important issue for us since if they determine the answer to this question is NO they will make us take a write off of the $4m on our 2012 Income Statement.  That would be bad….**"  (emphasis added).

299.    Shortly thereafter, on March 12, 2013, Silvestri emailed Masterson stating, "Bad news, Blue [CCMH's auditor] mentioned that there will be language in the draft financials mentioning going concern.  They mentioned that accumulated losses of $13 million over the last several years as the primary reason.  I detected that maybe (big maybe), if we push, we might be able to get the language eliminated???  If included, I'm not sure what this does to our LOC??, vendors, board, community….. Thoughts please…."

300.    Removing this language from CCMH's audit had important financial implications for Genesis.  Genesis understood that if the going concern qualification language remained in CCMH's audit reports, it would be harder for Genesis to convince its auditors that CCMH would

be able to repay Genesis.

301.    Masterson wrote back to Silvestri right away stating that "perhaps we can write some language **that is acceptable to all of us**. **My major concern would be to keep it out of their opinion.**" (emphasis added).

302.    Masterson then arranged for a call with Blue and Silvestri to discuss the going concern issue.

303.    Genesis reviewed CCMH's draft audit report and on March 25, 2013, Masterson emailed Steve Ritzer at Blue directly explaining that "the $5 million line of credit ($4 million outstanding as of December 31, 2012) the line should be shown as non current on CCMH's balance sheet" [sic].

304.    Genesis' involvement with the removal of the going concern language continued and on May 23, 2013, a conference call was held with Blue, Chase, CCMH and Genesis.

305.    During this meeting, Silvestri presented information on CCMH's current financial operations, and Blue ultimately agreed to remove the going concern language.

306.    Masterson emailed Perry about this result on the same day, to which Perry wrote back "Good job guys!  This was a big one…."

307.    On May 24, 2013, Silvestri emailed the revised draft CCMH audit report to Masterson and the going concern language was removed.

308.    Similarly, the 2013 CCMH audit originally included the following going concern qualification that Genesis worked to remove from CCMH's audit:

> The accompanying consolidated financial statements have been prepared assuming the Association will continue as a going concern. As discussed in Note 4 to the consolidated financial statements, the Association did not meet certain covenants related to the debt outstanding at December 31, 2013. The bank may demand repayment of the related debt, though no such demand has been made. In addition, the Association had overdrawn their cash and cash

equivalents as of December 31, 2013 and the 1999 Revenue Bonds letter of credit expires on September 15, 2014 resulting in the associated debt to be classified as current. These conditions raise substantial doubt about its ability to continue as a going concern. The financial statements do not include any adjustments that might result from the outcome of this uncertainty. Our opinion is not modified with respect to this matter.

309.    On August 13, 2014, Silvestri emailed Masterson stating "Positive Conversation with [Blue].   We will be able to get the going concern language removed."   Masterson immediately forwarded this email to Perry.

310.    Removal of the going concern qualifications from CCMH's 2012 and 2013 audits as a result of Genesis' pressure also enabled CCMH to obtain waivers and extensions of letters of credit issued by Chase securing CCMH's bonds.

311.    Had going concern qualifications been included in the audits, the Chase letter of credit likely would not have been extended, resulting in bond default and leading the bond trustee to exercise remedies.

312.    This would have likely led to a restructuring or sale of CCMH at least two years before the Petition Date and avoided CCMH's deepening insolvency.

## V.    GENESIS FURTHER CONTROLLED CCMH THROUGH ITS FOUR MILLION DOLLAR CAPITAL CONTRIBUTION.

313.    During the life of the Management Agreement, Genesis also controlled and directed the financing it provided CCMH in order to further Genesis' goals, including to position itself for affiliation while foregoing an expectation of repayment.

314.    The Purported Loan Documents facilitated Genesis' capital contribution to CCMH.

315.    Genesis did purport to keep track of the amount of money that CCMH owed to Genesis, but chose a strategy that suited Genesis in the moment, including for example, by deferring payments without penalty, by strategizing as to what policies would reflect most

48

favorably on Genesis' financial statements, and by choosing to never declare an event of default under the Purported Loan Documents even though CCMH did not regularly make its interest payments to Genesis.

316.    In February 2013, after CCMH made a decision that Genesis disagreed with, Masterson wrote to Perry, "They could have paid us back first."  Perry replied, "Yea, and then some . . . **We'll get it out of them one way or another."**  (Emphasis Added).

317.    Perry continued, "Had a good discussion with Bob [Miller] this afternoon.  Andy has set him on a good path that I am really going to be able to work with.  His goals are spot on. Will tell you more next week.  If it helps at all, I predict we will look back on this week as where we nailed the lid shut on TR.  That piece of paper you showed me from Karen is the first definitive nail in his coffin. Enjoy your weekend."

## W.    GENESIS FAILED TO MANAGE AND OPERATE CCMH ON A FINANCIALLY PRUDENT BASIS.

318.    An explicit purpose of the Management Agreement was for CCMH "to improve its operating and financial performance" and for Genesis to "ensure at all times that CCMH is administered on a financially prudent basis."  *See* Management Agreement, Whereas Clause, ¶ 1.3(b).

319.    Genesis failed to administer, manage and operate CCMH on a financially prudent basis.

320.    In order to further the Genesis Plan, Genesis required CCMH to make decisions and enter into agreements that benefitted Genesis' interest in providing services to CCMH but that CCMH did not need and could not afford.

321.    Perry wrote, "When it comes to CCMH, one of our specific goals is to elevate the clinical quality bar multiple steps on the ladder in each of their service lines . . . I can make sure

happens in a way that pave the way for replacing the current players . . . ."

322. In advancing the Genesis Plan, Genesis signed CCMH up for services and agreements that would require CCMH to implement "Cadillac" plans and services to a "World Class" degree that were not reasonable or realistic for CCMH given its size and financial position.

323. Shortly after executing the Management Agreement, and pursuant to the Genesis Plan, Genesis began laying the groundwork to replace CCMH's electronic medical record provider, Meditech, with its own electronic medical record provider, Epic.

324. Genesis had implemented Epic prior to the Management Agreement and considered it to be a "World-Class" Electronic Medical Record system.

325. Genesis made a significant monetary investment in implementing Epic.

326. Prior to being under the control of Genesis, CCMH had undertaken a review of whether to install Epic at CCMH and after review, it chose not to pursue that option.

327. Epic was extremely costly to implement and was designed for large health care systems. It was uneconomical for use in a small hospital like CCMH.

328. Genesis disregarded these concerns because it needed CCMH to switch to Epic in order to further the Genesis Plan.

329. Genesis viewed an integrated EMR system a key priority because, among other reasons, (i) adding CCMH to Epic would lower Genesis' Epic costs, (ii) it would lead to "improved referral processes and stickiness as [Genesis brought] CCMH [p]hysicians live," (iii) in the words of Perry, it would "knit" the two communities together, and (iv) CCMH needed to be on the same EMR platform as Genesis in order for Genesis to pursue offering lab services to CCMH, which was also a high priority for Genesis.

330.    Prior to switching to Epic, CCMH already paid Meditech license and implementation fees for software installed at CCMH.

331.    CCMH had to expend unnecessary capital installing and licensing Epic.

332.    Additionally, Epic's monthly fees were significantly higher than Meditech's monthly fees.

333.    It was unnecessary for CCMH, a hospital that was having severe financial difficulties, to expend significant capital implementing a new "World Class" EMR system instead of focusing on other priorities which could have improved CCMH's financial condition.

334.    By switching to Epic, CCMH had to spend money on Epic's initial installation costs, even though CCMH already paid initial installation costs when Meditech installed its system at CCMH.

335.    Genesis entered into the EMR Agreement for Genesis' benefit, rather than to help CCMH survive as a standalone hospital or look most attractive to third-party hospital systems.

336.    Under the EMR Agreement, Genesis granted CCMH the right to use certain software and technology, including, but not limited to, the License and Support Agreement by and between Genesis and Epic.

337.    The EMR Agreement required CCMH purchase, install, and maintain certain equipment and software as required by Genesis at CCMH's sole expense.

## X.    GENESIS REQUIRED CCMH TO USE ITS LABORATORY SERVICES AND NEGOTIATED THE AGREEMENT IN BAD FAITH.

338.    Genesis was focused on providing laboratory services to CCMH since as early as 2009 and contemplated making an investment in CCMH in 2009 to further this purpose.

339.    On May 18, 2009, an internal email at Genesis titled "Coshocton labs" stated "[t]hey use Lab Corp for their reference lab. Is there any way you might be able to investigate

Greg's [Greg Nowak, former CEO of CCMH] commitment to them? We could potentially save them some cash. We would need to invest in some information technology with respect to interfaces."

340.    Genesis saw its arrangement with CCMH beginning in 2012 as an opportunity to provide laboratory services to CCMH.

341.    Pursuant to the laboratory services agreement, executed on December 16, 2014, between Genesis and CCMH (the "Lab Services Agreement"), CCMH retained Genesis as CCMH's exclusive provider of laboratory services to serve the patients at CCMH.

342.    Under the Lab Services Agreement, Genesis provided day-to-day operations of the on-site laboratory at CCMH and provided for off-site laboratory services in exchange for CCMH paying Genesis.

343.    Under the Lab Services Agreement, Genesis would invoice CCMH on a monthly basis based on individual tests performed during the previous month.

344.    The Lab Services Agreement also included a sale component, pursuant to which Genesis purchased assets held by CCMH to assist in performing the laboratory services. CCMH owned certain assets located on its premises where Genesis furnished its laboratory. As Genesis would now be providing laboratory services, CCMH no longer had a use for such assets and sold them to Genesis under the Lab Services Agreement asset purchase agreement (the "APA").

### i.    Bricker Was Hired By Genesis To Represent Both CCMH And Genesis In Negotiating The Laboratory Services

345.    Genesis tasked Bricker with preparing the Lab Services Agreement and APA on behalf of both CCMH and Genesis.

346.    Bricker recognized this inherent conflict, but believed if it obtained a conflict waiver it could effectively negotiate for the two opposing parties. If a conflict then arose, it

would withdraw from representing Genesis—the party Bricker was originally representing in this matter and who initially brought them the assignment—and would continue with its representation of CCMH.

347.    On July 16, 2014, Karen Smith at Bricker emailed Wildi a conflict of interest waiver explaining:

> **Genesis has asked Bricker to prepare the Laboratory Service Agreement between Genesis and Coshocton**.  Because the hospitals are still independent of each other, we need to obtain a conflict of interest waiver . . . .  **While in this area (Laboratory Services Agreement) Bricker is representing Genesis** and cannot review the agreement on behalf of Coshocton, we have asked Genesis to waive any conflict that our representation of other matters with Coshocton might raise and we are asking Coshocton to waive any conflict with respect to this Laboratory Services Agreement . . . .  **At any point, if negotiations become contentious between Genesis and Coshocton, Bricker would withdraw from representing Genesis in that matter.**

348.    Wildi signed the conflict waiver after Bricker had already drafted the bulk of the Laboratory Services Agreement.

349.    Further, Wildi was not clear for which document she was signing the conflict waiver and went to Genesis' general counsel, Wendy Cedoz ("Cedoz"), for advice on the matter.

350.    After Wildi signed the conflict waiver she followed up with Cedoz on July 28, 2014, stating that she was "a little perplexed when I received [the conflict request] from Karen [attorney at Bricker].  I understood we were very close to having the Lab agreement completed based on our conversation.  Can you please explain which Agreement Karen [attorney at Bricker] is referring to?"

351.    Genesis viewed any conflict of interest in negotiating this key agreement as "low risk."

352.    On December 5, 2014, Cedoz emailed the Genesis and CCMH teams attaching the latest revisions to the Laboratory Service Agreement.  She stated:  "I spoke with Karen Smith

[Bricker] yesterday regarding the review of the contract(s) from Coshocton's perspective. Originally, Bricker was not going to review on behalf of Coshocton due to conflict. **I agreed to sign a conflict waiver so that Bricker can review because I view the conflict issue as low risk**" (emphasis added).

      ii.    **Genesis Hired Blue, CCMH's Auditor, To Perform The Fair Market Value Determination For The Lab Services Agreement And Then Rushed Blue's Preparation So Genesis Could Quickly Enter The Agreement**

353.    Blue, CCMH's auditor since at least 2012, was hired by Genesis in July 2014 to provide a calculation report as to an estimation of the fair market value of the laboratory services provided by Genesis to CCMH.

354.    Genesis rushed Blue's preparation of its fair market value determination so it could quickly enter the Lab Services Agreement.

355.    At the end of October 2014, Cedoz asked Tammy Bruner, Director of Laboratory Services at Genesis, to explain the increase in costs for Genesis' lab services over the past several years. Ms. Bruner responded that she did not have that information easily accessible but explained generally how she came up with her figures. Cedoz then forwarded this email to Blue and asked if this concept fell within fair market value, especially since Genesis and CCMH were competitors.

356.    Blue responded that it needed to discuss internally, to which Cedoz stated "you probably see where I am struggling with this. They would like me to get the agreement signed with Coshocton next week but I am uncomfortable until I know where you are going to fall from the FMV perspective."

357.    On November 7, 2014, Blue asked Ms. Bruner for additional information on laboratory services. Cedoz wrote back to Blue stating "Do we need to discuss what additional

info you need?  I feel as if you are getting a one sentence answer to items that need to be addressed in more detail.  Can you clarify whether my feeling is correct?"

358.    Blue wrote back that they think they have enough on which to base their fair market value determination and Cedoz replied asking for "a[n] indication of when you could have this done?  I really need to get this agreement out and wanted to wait for your approval first."

359.    Blue sent Cedoz the fair market value report on November 14, 2014.

360.    Cedoz asked for the report in a word document so she could make redlined comments to Blue's report.

361.    Upon information and belief, since the parties waived any conflict of interest, CCMH did not have its own counsel to review the fair market value report or Cedoz's redlined comments.

362.    The Lab Services Agreement was executed on December 16, 2014.

**Y.    BRICKER WAS CONFLICTED IN ITS REPRESENTATION OF CCMH AND MANNING TOOK NO ACTION WITH RESPECT TO THIS CONFLICT.**

363.    Bricker's conflict of interest in representing CCMH and Genesis came to a head during a 2014 CCMH Board meeting.

364.    On September 10, 2014 (the "September Board Meeting"), the CCMH Board met to discuss, among other things, the recommended next steps in the relationship between CCMH and Genesis, including a proposal to develop a "Sustainable Integration Model."

365.    In advance of the September Board Meeting, Perry asked Gire, Genesis' attorney, to represent CCMH at the meeting.

366.    On September 4, 2014, Perry emailed Wildi stating that "I also was able to determine that Mike Gire will be representing CCMH at the meeting next week.  That way the

CCMH Board can (and should) ask him all the questions and advise they want."

367.    The minutes of the September Board Meeting state that "Mr. Perry also thanked Mr. Gire for attending as the legal attorney for this Board and to address any questions throughout the meeting."

368.    Manning was in attendance at the meeting and neither Manning nor Gire raised concern with Gire's representation of CCMH.

369.    At the September Board Meeting, in reference to CCMH's relationship with Genesis, Perry informed the board that "the current 'Model' and approach is not enough to put CCMH on stable footing."

370.    The September Board Meeting minutes state that "Mr. Gire highlighted the current Management Contract Key Components:  It is a 5 year contract and the CEO is accountable to CCMH Board and Genesis Administration . . . . Management Contract by definition limits what Genesis and CCMH can do together.  They are still competitors."

371.    Neither Gire nor Manning commented on any conflict of interest with respect to the arrangement that Genesis was operating as CCMH's manager even though the parties were competitors.

372.    Another key component Gire highlighted was that "Genesis [was the] guarantor of up to $5M line of credit."

373.    Gire incorrectly described the financing arrangement to the CCMH Board, as Genesis directly provided $4 million to CCMH in August 2012, rather than guaranteeing a $5 million line of credit.

374.    Perry then explained the recommended next steps in the CCMH turnaround process, which included the development of an integration model task force to include Gire as

the legal representative of CCMH.

375.    Perry was then excused for the remainder of the meeting to allow further discussions on the recommended sustainable integration model.  Gire stayed to answer questions from the CCMH Board.

376.    Again, even after Perry left the meeting, neither Gire nor Manning raised any concern with Gire's legal representation of CCMH.

377.    Manning and Gire continued to attend board meetings, including certain closed session meetings.

378.    As late as May 4, 2015, Bricker was still performing legal services for CCMH.

379.    At a board meeting on May 4, 2015, Gire provided an update on the CCMH due diligence process that commenced in the fall of 2014 and Christine Poth, another Bricker associate, provided an update on the CCMH Department of Labor audits.

## Z.    GENESIS FAILED TO MEET ITS DUTIES AND OBLIGATIONS IN MANAGING CCMH.

### i.    Genesis Failed To Implement The Recommendations Of American Healthcare Solutions.

380.    Under the Management Agreement, Genesis was required to "undertake, **at its expense**, such due diligence, review, studies and investigations as it deems appropriate . . . [and] as soon as feasible following the Effective Date, present to the Board, the proposed Operating Plan, which Operating Plan is intended to address issues discovered during Manager's due diligence of CCMH."  *See* Management Agreement, ¶ 8.1.2 (emphasis added).

381.    Genesis retained American Healthcare Solutions ("AHS") in June 2012 pursuant to Paragraph 8.2 of the Management Agreement to conduct a Snapshot for Organization Success (SOS).

382.    On or around August 21, 2012, AHS shared the SOS recommendations with

Genesis.

383.    AHS identified that future goal of CCMH was to "[C]ontinue to provide quality healthcare services to the Greater Coshocton community and to become a viable competitor and employer of choice in the region."

384.    This goal identified by AHS was directly contrary to the Genesis Plan.

385.    AHS provided a list of recommendations to Genesis that would improve CCMH and help CCMH achieve its goals (the "AHS Proposal").

386.    For example, the AHS Proposal recommended CCMH implement "Sharp Staffing," which required a reduction in staffing force corresponding to the downturn in patient volume at the Hospital.

387.    With respect to Sharp Staffing, the AHS Proposal stated "implement action plans to achieve recommended staffing levels within 60-180 days.  Preliminary Sharp Staffing projections reflect annual staffing cost reductions of $2.9M in the initial year with additional cost savings in future periods."

388.    Despite the clear cost savings projected in the AHS Proposal and the recommendation to implement a reduction in force within 60-180 days, Genesis did not make these changes until the Spring of 2014.

389.    Similarly, the AHS Proposal recommended a management reduction in force corresponding to the staff reduction in force, which also was not implemented by Genesis until Spring 2014.

390.    The AHS Proposal also focused on adding productivity incentives to physician contracts.

391.    The AHS Proposal stated "Benchmark physician practices against MGMA

3594448

standards and establish financial goals and targets relative to volume, productivity and service for each practice."  It noted that "physicians are not held accountable for growing their practices and increasing referral volume."

392.   Genesis did not implement the physician contract changes suggested in the AHS Proposal.

393.   Rather, under Genesis, physician contracts were extremely costly, given the low number of surgeries the physicians performed.

394.   For example, two surgeons at CCMH had salaries of approximately $1 million in the aggregate, but performed only a minimal number of surgeries per year.

395.   The AHS Proposal also recommended that CCMH "immediately approach current major vendors to negotiate timely payments of existing debt for significant discounts."

396.   Genesis failed to work with existing vendors to negotiate significant discounts. Genesis failed to consider using less costly providers as an alternative.

397.   Rather, at times, Genesis required CCMH use more expensive providers, such as switching from Meditech to Epic, despite Epic's increased monthly cost and installation fees and the fact that CCMH did not require such elaborate EMR services.

398.   AHS regularly met with Miller to discuss the AHS Proposal and encourage implementation of its recommendations, yet Miller did not make the recommended changes.

399.   Without Genesis or Miller taking steps to implement the AHS Proposal, CCMH continued to struggle financially.

400.   It was not until Wildi took over as CEO of CCMH in February 2014, that CCMH began to meaningfully implement the recommendations in the AHS Proposal as Wildi relied on it to effectuate change at the Hospital.

401.    For example, the AHS Proposal stated that CCMH should "consider eliminating practices that are highly unprofitable" and "conduct a thorough financial and clinical review of the following service lines and programs to determine if they are appropriate and necessary for the continued viability of the organization:  Obstetrics . . ."

402.    Despite the AHS Proposal in 2012, Genesis failed to implement the closure of the unprofitable obstetrics practice until sometime in 2015.

403.    The closure of the obstetrics practice was ultimately implemented after Wildi became CEO and began to exert her independence from Genesis.

404.    Further, under Wildi's guidance, CCMH eliminated the use of locums—doctors hired on an hourly basis, who were more costly than hiring full-time doctors.

405.    Genesis hoped to staff CCMH with its own doctors and Miller and Perry used locums in the interim rather than hiring full-time CCMH doctors.

406.    Wildi recognized the use of locums was cost-prohibitive to CCMH and instead hired full-time doctors at CCMH.

407.    Wildi also achieved success in bringing in an outside orthopedic group to offer services at CCMH, despite Perry's plan to eliminate the orthopedic practice at CCMH and use Genesis' group instead.

408.    Bringing in an outside group stopped the outflow of patients who came to CCMH for orthopedic needs.

409.    Wildi implemented billing and collection changes as well, and in 2016 saw an improvement of approximately $5.3 million.

410.    Genesis failed to address these issues in 2012 when it received the AHS Proposal, causing CCMH to slide further into insolvency.

411.    Although Wildi adopted the AHS Proposal in February 2014 when she took over as CEO, by this time Genesis had caused CCMH irreparable damage from which it could not recover.

>    **ii.    Under Genesis' Management, CCMH Ceased Making Payments To Providers Of Its Self-Insured Healthcare Plan, Leaving CCMH Employees To Suffer.**

412.    CCMH had a self-insured healthcare plan.

413.    As manager of CCMH, Genesis was responsible for working with CCMH to make payments to the providers of CCMH's healthcare plan who treated CCMH employees and their families.

414.    Under Genesis' management, CCMH was able to make certain interest payments on the Purported Loan, yet ceased making payments to providers of CCMH's self-insured plan.

415.    CCMH employees and their families depended on CCMH to cover their medical expenses pursuant to their healthcare plan.

416.    As a result of Genesis' mismanagement, CCMH employees and their families were unable to timely pay for their required medical services.

417.    As of the Petition Date, there were approximately $3.2 million of unpaid healthcare claims.

>    **iii.    Under Genesis' Control, CCMH Deteriorated.**

418.    Genesis had complete control over CCMH for nearly three and a half years.

419.    Under Genesis' leadership, CCMH's operations deteriorated.

420.    In the fall of 2015, Genesis prepared a presentation titled "Coshocton County Memorial Hospital Current Situation-Next Steps," dated October 29, 2015.  The presentation notes that CCMH's financial condition "continues to erode" and that "vendors and health claims continue to lag.  Average vendor payment days has increased from 123 to 160 days (industry

average 60).  Vendors have begun filing liens, developing payment plans, etc."

421.    The presentation also describes several of the inherent conflicts in the Genesis-CCMH relationship.

422.    In a slide titled "Conflicts Rising," the presentation states:  "CCMH current financial position, CCMH Boards perception of Genesis' performance in development of clinical programs and Genesis position as perceived competitor, largest creditor, and Board representation has caused both parties to reevaluate its current relationships."  The presentation recommends, among other things, for Genesis to temporarily suspend its duties under the management agreement and for Perry to resign from the CCMH Board.

423.    In November 2015, CCMH and Genesis suspended the Management Agreement.

424.    In 2016, the parties terminated the Management Agreement and Prime Healthcare Foundation, Inc. and Prime Healthcare Foundation-Coshocton, LLC were together identified as a stalking horse purchaser of Coshocton Hospital.

425.    On June 30, 2016 CCMH filed its petition for relief under chapter 11 of the Bankruptcy Code.

## AA.    GENESIS CONTINUED TO PURSUE THE GENESIS PLAN AFTER LEADING CCMH INTO BANKRUPTCY.

426.    After the Management Agreement was terminated, Genesis emerged a more successful health care system than when it started and CCMH filed for bankruptcy.

427.    In June 2016, a representative from Genesis assured the public that despite CCMH's Bankruptcy—in accordance with the Genesis Plan—that, "Genesis will continue to provide the patients of Coshocton County with access to high-quality health care services."  *See* http://www.zanesvilletimesrecorder.com/story/news/local/2016/06/30/coshocton-hospital-owes-millions-genesis/86556644/.

**BB.** **CCMH MADE PREFERENTIAL PAYMENTS TO GENESIS IN THE ONE YEAR PERIOD AND NINETY DAY PERIOD PRIOR TO THE PETITION DATE.**

428.    During the one year period prior to the Petition Date, that is, between June 30, 2015 through and including June 29, 2016, CCMH operated its business affairs, including the transfer of property, either by checks, wire transfers, direct deposits or otherwise to various entities.

429.    As CCMH's manager under the Management Agreement, Genesis was an insider of CCMH from June 30, 2015 through and including November 12, 2015, the date the Management Agreement was suspended (the "Insider Preference Period").

430.    Plaintiff has determined that transfers of interests of CCMH's property were made to or for the benefit of Genesis during the Insider Preference Period aggregating an amount not less than $360,024.85 (the "Insider Transfers").  The Insider Transfers are listed on Exhibit A hereto.

431.    Plaintiff has determined that transfers of interests of CCMH's property were made to or for the benefit of Genesis during the ninety (90) day period prior to the Petition Date (the "90 Day Preference Period," and together with the Insider Preference Period, the "Preference Periods"), that is between April 1, 2016 through and including June 29, 2016, aggregating an amount not less than $791,213.96 (the "Creditor Transfers").  The Creditor Transfers are listed on Exhibit B hereto.

432.    Plaintiff has also determined that, during the Preference Periods, Genesis received periodic payments through MedBen on account of healthcare claims (the "MedBen Transfers," and together with the Insider Transfers and the Creditor Transfers, the "Transfers," and individually, each a "Transfer").  Since CCMH paid its healthcare claims through MedBen, Plaintiff does not currently possess the necessary information to determine the exact amounts of

the MedBen Transfers, although Plaintiff is working to obtain this information from MedBen.

433.    Plaintiff will amend this original Complaint as and when the exact amounts of the MedBen Transfers are determined.

434.    Each Transfer was to or for the benefit of Genesis, as a creditor, within the meaning of 11 U.S.C. § 547(b)(1) because each Transfer either reduced or fully satisfied a debt or debts then owed by the Debtor to Genesis.

435.    Each Transfer was made for, or on account of, an antecedent debt or debts owed by the Debtor to Genesis before such Transfers were made, each of which constituted a "debt" or "claim" (as those terms are defined in the Bankruptcy Code).

436.    Each Transfer was made while the Debtor was insolvent.  Among other things, as evidenced by the Debtor's Schedules filed in the Chapter 11 Case, as well as the proofs of claim that have been received to date, the Debtor's liabilities exceeded its assets on the Petition Date.

437.    Each Transfer was made during one of the Preference Periods.

438.    As a result of each Transfer, Genesis received more than Genesis would receive if:  (i) this case was under chapter 7 of the Bankruptcy Code; (ii) the Transfers had not been made; and (iii) Genesis received payments of its debts under the provisions of the Bankruptcy Code.  This is evidenced by the fact that unsecured creditors, under the Plan, have received or will receive less than the full amounts they are owed.

439.    During the course of this action, Plaintiff may learn (through discovery or otherwise) of additional transfers made to Genesis during the Preference Periods.  It is Plaintiff's intention to avoid and recover all transfers of an interest of the Debtor in property that were made by the Debtor to or for the benefit of Genesis or any other transferee.  Plaintiff reserves its right to amend this original Complaint to include: (i) further information regarding the Transfers,

(ii) additional transfers, (iii) additional defendants, and/or (iv) additional causes of action, including without limitation, actions under 11 U.S.C. §§ 542, 544, 545, and/or 548, if applicable (collectively, the "Amendments"), that may become known to Plaintiff at any time during this action, through formal discovery or otherwise, and for the Amendments to relate back to the date of the filing of this original Complaint.

## COUNT I
## (BREACH OF CONTRACT)
### (As To Defendant Genesis)

440.     The Debtor Representative repeats and realleges all prior allegations as if fully set forth herein.

441.     On June 15, 2012, CCMH and Genesis entered into the Management Agreement, pursuant to which, among other things, Genesis (i) provided the key executive personnel to manage CCMH on a day-to-day basis (including the CEO and CFO); (ii) acquired a seat on the CCMH Board, filled by Genesis' CEO, Perry, (iii) was responsible for, among other things, strategic planning, financial management and physician recruiting, and (iv) would act in good faith and with reasonable skill and due diligence while discharging its responsibilities.

442.     Genesis breached the Management Agreement because Genesis managed CCMH for Genesis' own benefit, rather than to help CCMH survive as a standalone hospital.

443.     Genesis breached, *inter alia*, section 1.3 because it did not perform its obligations as manager in good faith and with reasonable skill and due diligence.

444.     Genesis breached, *inter alia*, section 1.3(b) because it did not administer, manager and operate CCMH on a financially prudent basis.

445.     Genesis breached, *inter alia*, section 1.3(e) because it did not use reasonable efforts to ensure that CCMH maintained and enhanced a medical staff qualified to meet patient needs.

446.    Genesis breached, *inter alia*, section 1.4 because in placing Perry, CEO of a competing hospital, on the CCMH Board, the CCMH Board could not exercise control as is customarily exercised by a board of directors.

447.    Genesis breached, *inter alia*, section 3.3.4 because it did not put in place a process to ensure that no managed care contract information or critical terms were shared by the executive management group at CCMH with Genesis.

448.    Genesis breached, *inter alia*, section 6.1 because Perry learned confidential CCMH information in his capacity as a CCMH Board member, while also serving as CEO of Genesis.

449.    CCMH performed its obligations under the Management Agreement during the term thereof.

450.    CCMH suffered damages as a result of Genesis' breaches in an amount to be determined at trial.

**COUNT II**
**BREACH OF FIDUCIARY DUTY**
**(As To Defendant Genesis)**

451.    The Debtor Representative repeats and realleges all prior allegations as if fully set forth herein.

452.    Genesis owed fiduciary duties to CCMH and its creditors as a result of, *inter alia*:

(a)     its position as Manager pursuant to the Management Agreement;

(b)     its authority, control and responsibility for CCMH's operations and finances vested in it by the Management Agreement;

(c)     its position of special trust and confidentiality with CCMH;

(d)     its superiority, control and/or influence over CCMH; and

(e)     its actual course of conduct.

453.    As manager of CCMH, Genesis owed fiduciary duties to CCMH and its creditors to act: (i) in good faith; (ii) with the care that a person in a like position would use under similar circumstances; and (iii) in a manner that he believed to be in or not opposed to the best interests of CCMH.

454.    Genesis, because of its positions of control, influence and authority, was able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

455.    Genesis breached its fiduciary duties, including, by among other things:

(a)    failing to keep the interests of CCMH and its objectives above the interests of Genesis;

(b)    managing CCMH for its own benefit rather than for the benefit of CCMH, its creditors and the community at large;

(c)    competing with CCMH for market share, patients, and physician recruiting and employment, including using its superior position to constrain CCMH's ability to compete;

(d)    suppressing the ability of CCMH to recruit and retain physicians;

(e)    using CCMH's confidential information to benefit Genesis in spite of the provisions of the Management Agreement protecting such confidential information;

(f)    requiring CCMH to enter into agreements and arrangements which it did not need and could not afford;

(g)    requiring CCMH to expend resources which were not necessary and which it could not afford;

(h)    failing to implement the recommendations of AHS; and

(i)    prioritizing payments of healthcare claims owed to Genesis.

456.     In addition, as Manager, Genesis owed fiduciary duties to CCMH to (i) familiarize itself with the financial condition of the hospital; and (2) take appropriate action based on that condition.

457.     These duties included the obligations to ensure that CCMH was administered on a financially prudent basis, and given the deepening insolvency of CCMH, to prevent further incurring of indebtedness that there was no reasonable prospect of repaying.

458.     Genesis' failure to exercise the required degree of diligence, care, and skill that a reasonably prudent manager would exercise under similar circumstances, allowed CCMH to continue operating at a substantial loss and caused CCMH to accrue liabilities that it was unable to satisfy, resulting in CCMH's insolvency and deepening insolvency.

459.     By reason of the foregoing, Genesis breached its fiduciary duties and, as a result, CCMH and its creditors have been damaged thereby.

## COUNT III
## BREACH OF FIDUCIARY DUTY
### (As To Defendant Perry)

460.     The Debtor Representative repeats and realleges all prior allegations as if fully set forth herein.

461.     As a CCMH board member with full voting authority, Perry owed CCMH both a duty of loyalty and a duty of care.

462.     Perry was vested with the authority to conduct the affairs of CCMH and owed fiduciary duties to CCMH and its creditors to act: (i) in good faith; (ii) with the care that a person in a like position would use under similar circumstances; and (iii) in a manner that he believed to be in or not opposed to the best interests of CCMH.

463.     Additionally, Perry owed fiduciary duties to CCMH and its creditors as a result of, *inter alia*, his position as CEO of CCMH's Manager—Genesis—including the administration

and control of the Executive Management Group, which resulted in Perry assuming a position of special trust and confidentiality with CCMH and Perry's superiority, control and/or influence over CCMH.

464.    Perry, because of his positions of control, influence and authority, was able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

465.    Throughout his tenure as director and/or manager of CCMH, Perry was incapable of rendering independent judgment to avoid violating his fiduciary duties to CCMH and maintained undivided loyalty to Genesis.

466.    Perry acted with deliberate intent to cause injury to CCMH and/or with a reckless disregard for the best interests of CCMH by, among other things:

(a)    failing to keep the interests of CCMH and its objectives above his personal interests or those of Genesis;

(b)    failing to fully disclose his personal interests and/or the interests of Genesis when he made decisions, presented ideas or information, and/or voted as a board member for CCMH including in regards to transactions between the hospitals;

(c)    competing, on behalf of Genesis, with CCMH for market share, patients, and physician recruiting and employment, including designing and implementing programs to achieve Genesis' goals to the detriment of CCMH and using Perry's superior position to constrain CCMH's ability to compete;

(d)    using CCMH's confidential information to benefit Genesis in spite of the provisions of the Management Agreement protecting such confidential information;

(e)    requiring CCMH to enter into agreements and arrangements which it did not need and could not afford;

(f)     requiring CCMH to expend resources which were not necessary and which it could not afford; and

(g)     failing to implement the recommendations of AHS.

467.    Perry benefitted from his position as director of CCMH by, among other reasons, allowing him to further solidify his value to his employer Genesis and to receive the benefits and compensation that came along with those efforts.

468.    Perry acted in bad faith toward CCMH by making decisions and convincing other decision-makers and staff at CCMH to trust that he and Genesis had CCMH's best interests in mind when in fact he had a dishonest purpose and an ulterior motive of benefiting Genesis to the detriment of CCMH (and its creditors) and used his position of influence and control to further his own personal interests as well as those of Genesis.

469.    In addition, Perry owed fiduciary duties to CCMH to (i) familiarize himself with the financial condition of the hospital; and (2) to take appropriate action based on that condition. These duties included the obligations to ensure that CCMH was administered on a financially prudent basis, and given, the deepening insolvency of CCMH, to prevent further incurring of indebtedness that there was no reasonable prospect of repaying.

470.    Perry's breach of his fiduciary duties and deliberate intent to cause injury to CCMH and/or reckless disregard for the best interests of CCMH allowed CCMH to continue operating at a substantial loss, permitted CCMH's insolvency to deepen, caused CCMH to accrue liabilities that it was unable to satisfy, and failed to consider and affected CCMH's ability to carry out its purposes including its charitable mission and the care and treatment of sick, injured, aged, afflicted, infirm, disabled, and/or destitute persons.

471.    By reason of the foregoing, Perry breached his fiduciary duties and, as a result,

CCMH and its creditors have been damaged thereby.

**COUNT IV**
**BREACH OF FIDUCIARY DUTY**
**(As To Defendant Miller)**

472.     The Debtor Representative repeats and realleges all prior allegations as if fully set forth herein.

473.     As CEO of CCMH, Miller owed fiduciary duties to CCMH and, upon CCMH's insolvency, to its creditors to act: (i) in good faith; (ii) with the care that a person in a like position would use under similar circumstances; and (iii) in or not opposed to the best interests of CCMH.

474.     As CEO of CCMH, Miller also owed duties to CCMH under the CCMH bylaws to, *inter alia*, (i) supervise all business affairs and to ensure that all funds were collected and expended to the best advantage possible; (ii) to attend all meetings of the CCMH Board and to advise with its committees; and (iii) to perform any other duty that may have been necessary in the best interests of the Hospital.

475.     Miller, because of its positions of control and authority, was able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

476.     Miller breached his fiduciary duties to CCMH, including, by among other things:

(a)     failing to perform duties in the best interests of the Hospital;

(b)     failing to keep the interests of CCMH and its objectives above his own interests or those of Genesis;

(c)     failing to supervise all business affairs and to ensure that all funds were collected and expended to the best possible advantage;

(d)     failing to keep the CCMH board informed and to advise with its committees;

(e)     failing to negotiate in good faith on behalf of CCMH in entering the Management Agreement and/or Purported Loan Documents;

(f)     using CCMH's confidential information to benefit Miller and Genesis;

(g)     requiring CCMH to expend resources which were not necessary and which it could not afford;

(h)     influencing or causing others to influence Blue to exclude the "going concern" language from audit reports for CCMH's 2012 and 2013 financial statement;

(i)     failing to implement the recommendations of AHS; and

(j)     failing to fulfil his duties under CCMH's Code of Regulations, including its constitution and bylaws.

477.    In addition, Miller owed fiduciary duties to CCMH to (i) familiarize itself with the financial condition of the hospital; and (2) take appropriate action based on that condition. These duties included the obligations to ensure that CCMH was administered on a financially prudent basis, and given, the deepening insolvency of CCMH, to prevent further incurring of indebtedness that there was no reasonable prospect of repaying.

478.    Miller's failure to exercise the required degree of diligence, care, and skill that a reasonably prudent person would exercise under similar circumstances, allowed CCMH to continue operating at a substantial loss and caused CCMH to accrue liabilities that it was unable to satisfy, resulting in CCMH's insolvency and deepening insolvency.

479.    By reason of the foregoing, Miller breached his fiduciary duties and, as a result, CCMH and its creditors have been damaged thereby.

**COUNT V**
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1**
**(As To Defendants Genesis, Perry and Miller)**

480.    The Debtor Representative repeats and realleges all prior allegations as if fully set

forth herein.

481.    Through the conduct alleged in this complaint, during the time that the Management Agreement was in effect between June 2012 and November 2015, Genesis violated Section 1 of the Sherman Act by, upon information and belief, increasing prices for medical services in the relevant market (defined herein as the "Coshocton Market"), and/or curtailing CCMH's revenues.  This was accomplished by Genesis, inter alia, through restricting output for physicians by controlling physician recruitment at CCMH through the Management Agreement.

482.    The Management Agreement and other associated and subsequent agreements constituted concerted action and restrictive trade practices under Section 1 of the Sherman Act.

483.    Genesis is per se liable under Section 1 of the Sherman Act for the injuries and damages caused by its unreasonable and unlawful restraint of trade for which there is no legitimate business justification, and if any pro-competitive benefits were caused by Genesis' actions, those benefits were outweighed by the anti-competitive effects of Genesis' restraint of trade.  Any ostensible pro-competitive benefit was a mere pretext or could have been achieved by less restrictive means.

484.    As a direct and proximate result of Genesis' conduct, CCMH became less competitive in the Coshocton Market and CCMH's revenues diminished or CCMH was prevented from growing its revenues.

485.    CCMH's injuries are of the type antitrust laws were designed to prevent.

486.    As pleaded herein, the business operations of CCMH—and, Genesis' anticompetitive interference in those operations—substantially affected interstate commerce in several ways, including that, among others:

        (a)    CCMH, as a participant in Medicare and Medicaid, received federal

funding;

(b)     CCMH accepted payment from out-of-state and national insurers;

(c)     Upon information and belief, Genesis accepted payment from out-of-state and national insurers;

(d)     Pursuant to the Management Agreement, Genesis controlled CCMH's supply chain with a multitude of medical and other suppliers nationwide;

(e)     CCMH, as a result of Genesis' control and influence, entered into an EMR services contract with Epic, who does business nationwide;

(f)     In service of its own objective to expand its market share in the Coshocton Market and to broaden its reach, Genesis suppressed CCMH's ability to attract patients, including those enrolled in Medicare and Medicaid from out-of-state; and

(g)     Genesis is jointly governed by Wisconsin-based Franciscan Sisters of Christian Charity Sponsored Ministries and Bethesda Hospital Association.

487.    Based on Genesis' unlawful anticompetitive conduct, CCMH is entitled to recover consequential and treble damages and its costs of suit, including reasonable attorney's fees pursuant to 15 U.S.C. § 15(a).

## COUNT VI
### VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2
#### (As To Defendant Genesis)

488.    The Debtor Representative repeats and realleges all prior allegations as if fully set forth herein.

489.    From June 2012 to November 2015, Genesis possessed monopoly power in the Coshocton Market.

490.    As a result of its entering into the Management Agreement with CCMH, Genesis and CCMH acted effectively as a single entity, which resulted in Genesis obtaining 66% market

share in the Coshocton Market—sufficient market power to constitute a violation of section 2 of the Sherman Act.

491.    Genesis willfully acquired and maintained its monopoly power from June 2012 to November 2015 through the Management Agreement with CCMH, pursuant to which Genesis, unlawfully and improperly:

(a)    Exclusively provided key executive personnel to manage CCMH on a day-to-day basis;

(b)    Acquired a seat on the Board of CCMH, which was filled by Genesis' CEO, who simultaneously maintained and continued his position at Genesis;

(c)    Assumed exclusive responsibility and control over strategic planning, financial management and physician recruitment;

(d)    Precluded CCMH from affiliating with any other healthcare system during the term of and for two years after the termination or expiration of the Management Agreement;

(e)    Prevented CCMH from having authority to terminate the Management Agreement for cause; and

(f)    Misappropriated executive management resources from CCMH by not prorating CCMH executive compensation to be proportionally borne by Genesis for work performed for Genesis.

492.    Genesis did not acquire or maintain its monopoly power as a consequence of a superior product, business acumen or historical accident.

493.    Through its predatory and anticompetitive practices detailed herein, Genesis has harmed consumers, competition in the Coshocton Market and caused damages to CCMH.

494.    The Management Agreement with CCMH did not promote competition or

consumer welfare but rather suppressed the competition that CCMH provided in the Coshocton Market.

495.    As a direct and proximate result of the unlawful agreements, combinations and anticompetitive conduct set forth herein, CCMH sustained damages to its business and property.

**COUNT VII**
**ATTEMPTED VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**(As To Defendant Genesis)**

496.    The Debtor Representative repeats and realleges all prior allegations as if fully set forth herein.

497.    Even if Genesis did not achieve sufficient monopoly power, from June 2012 to November 2015, Genesis attempted to obtain monopoly power in the Coshocton Market.

498.    Genesis attempted to willfully acquire and maintain its monopoly power from June 2012 to November 2015 through the Management Agreement with CCMH, pursuant to which Genesis, unlawfully and improperly:

(a)    Exclusively provided key executive personnel to manage CCMH on a day-to-day basis;

(b)    Acquired a seat on the Board of CCMH, which was filled by Genesis' CEO, who simultaneously maintained and continued his position at Genesis;

(c)    Assumed exclusive responsibility and control over strategic planning, financial management and physician recruitment;

(d)    Precluded CCMH from affiliating with any other healthcare system during the term of and for two years after the termination or expiration of the Management Agreement;

(e)    Prevented CCMH from having authority to terminate the Management Agreement for cause; and

(f)    Misappropriated executive management resources from CCMH by not

prorating CCMH executive compensation to be proportionally borne by Genesis for work performed for Genesis.

499.    Through its attempted predatory and anticompetitive practices detailed herein, Genesis has harmed consumers, competition in the Coshocton Market and caused damages to CCMH, which conduct was likely to result in monopolization of the Coshocton Market.

500.    The Management Agreement with CCMH did not promote competition or consumer welfare but rather suppressed the competition that CCMH provided in the Coshocton Market, which evidenced Genesis' specific intent to acquire monopoly power.

501.    As a direct and proximate result of the unlawful agreements, combinations and attempted anticompetitive conduct set forth herein, CCMH sustained damages to its business and property and Genesis' actions and market position indicated that there was a dangerous probability that, if left unchecked, an actual monopoly position would be achieved.

### COUNT VIII
### VIOLATIONS OF THE VALENTINE ACT
### (As To Defendants Genesis, Perry and Miller)

502.    The Debtor Representative repeats and realleges all prior allegations as if fully set forth herein.

503.    This count is brought under Ohio Revised Code §§ 1331.01, et seq. (herein referred to as the "Valentine Act") for damages, including statutory treble damages.

504.    Genesis, Perry and Miller are each a "Person" as defined by §§ 1331.01(A) of the Ohio Revised Code.

505.    As a result of its entering into the Management Agreement with CCMH, and other associated and subsequent agreements, Genesis and CCMH acted effectively as a single entity, which resulted in Genesis obtaining 66% market share in Coshocton—sufficient market power to constitute a violation of the Valentine Act.

506. Through the conduct alleged in this complaint, during the time that the Management Agreement was in effect between June 2012 and November 2015, Genesis violated the Valentine Act, including but not limited to Ohio Revised Code §§ 1331.02 and 1331.04, by, upon information and belief, increasing prices for medical services in the Coshocton Market, and/or curtailing CCMH's revenues. This was accomplished by Genesis, inter alia, through restricting output by controlling physician recruitment at CCMH through the Management Agreement

507. As a result of Genesis' conduct, CCMH became less competitive in the market and CCMH's revenues suffered or CCMH was unable to grow its revenues.

508. Genesis a result of its entering into the Management Agreement with CCMH, Genesis and CCMH acted effectively as a single entity, which resulted in Genesis obtaining 66% market share in Coshocton—sufficient market power to constitute a violation of section 2 of the Sherman Act.

509. Genesis willfully acquired and maintained its monopoly power from June 2012 to November 2015 through the Management Agreement with CCMH, pursuant to which Genesis, unlawfully and improperly:

(a) Exclusively provided key executive personnel to manage CCMH on a day-to-day basis;

(b) Acquired a seat on the Board of CCMH, which was filled by Genesis' CEO, who simultaneously maintained and continued his position as Genesis;

(c) Assumed exclusive responsibility and control over strategic planning, financial management and physician recruitment;

(d) Precluded CCMH from affiliating with any other healthcare system during

the term of and for two years after the termination or expiration of the Management Agreement;

(e)   Prevented CCMH from having authority to terminate the Management Agreement for cause; and

(f)   Misappropriated executive management resources from CCMH by not prorating CCMH executive compensation to be proportionally borne by Genesis for work performed for Genesis.

510.   Genesis did not acquire or maintain its monopoly power as a consequence of a superior product, business acumen or historical accident.

511.   Through its predatory and anticompetitive practices detailed herein, Genesis has harmed consumers and caused damages to CCMH.

512.   The Management Agreement with CCMH did not promote competition or consumer welfare but rather suppressed the competition that CCMH provided in the Coshocton Market.

513.   As a direct and proximate result of the unlawful agreements, combinations and anticompetitive conduct set forth herein, CCMH  became less competitive in the Coshocton Market.

**COUNT IX**
**ACCOUNTANT AND PROFESSIONAL MALPRACTICE**
**(As To Defendant Blue)**

514.   The Debtor Representative repeats and realleges all prior allegations as if fully set forth herein.

515.   Blue had a duty to express an opinion on CCMH's 2012 and 2013 financial statements based on its audits.  Further, Blue had a responsibility to conduct its audits in accordance with auditing standards generally accepted in the United States of America ("GAAS"), the objective of which is to plan and perform those audits to obtain reasonable

assurance about whether the financial statements are free from material misstatement.

516. Due professional care was not exercised in the conduct of the relevant audits. Due Professional Care in the Performance of Work requires that the auditor exercise due professional care in the performance of the audit and the preparation of the report. Due professional care imposes a responsibility on the auditor to observe the standards of fieldwork and reporting. Blue failed to do so in performing its audits on CCMH's 2012 and 2013 financial statements and issuance of its audit opinion.

517. Blue also had a duty to exercise independent judgment in connection with the audits for 2012 and 2013.

518. Blue failed to exercise reasonable skill, diligence or knowledge, as required by GAAS, in performing its audits of CCMH for 2012 and 2013 financial statements and preparing its audit reports for 2012 and 2013, which an independent auditor in good standing in a similar community would have exercised.

519. By removing, or failing to include, "going concern" qualifications in each of its audit reports for CCMH's 2012 and 2013 financial statements, Blue failed to exercise reasonable care, skill, diligence, or knowledge that an auditor in good standing in a similar community would have exercised.

520. Blue failed to exercise reasonable skill, diligence or knowledge, as required by GAAS, by concluding in its audit reports of CCMH's 2012 and 2013 financial statements that such financial statements presented fairly in all material respects CCMH's financial position in accordance with GAAP as of fiscal year ends 2012 and 2013.

521. Blue's failure exercise reasonable skill, diligence or knowledge in auditing CCMH's financial statements for 2012 and 2013 caused CCMH damage by, among other things,

misrepresenting CCMH's financial condition to the CCMH Board and its creditors and enabling CCMH to continue to operate by incurring expenses and purchasing inventory that it was unable to afford and deepening its insolvency.

522.    By reason of the foregoing, Blue was negligent, committed auditor malpractice, and CCMH and its creditors were damaged thereby.

## COUNT X
## ATTORNEY MALPRACTICE
### (As To Defendant Bricker)

523.    The Debtor Representative repeats and realleges all prior allegations as if fully set forth herein.

524.    CCMH engaged Bricker as legal counsel to provide legal advice to CCMH.

525.    Bricker had an attorney-client relationship with CCMH.

526.    In performing its services as an attorney for CCMH, Bricker had a legal duty to exercise the degree of learning and exercise that degree of care and skill ordinarily possessed by a reputable law firm under similar circumstances.

527.    Bricker owed all customary and professional and fiduciary duties to CCMH, including a duty not to act adversely to CCMH's interests and to refrain from taking any action, or omitting to take any action, that would result in loss, injury, damage, harm or detriment to CCMH.

528.    Bricker failed to exercise the requisite level of care and skill.

529.    Bricker's negligence damaged CCMH in an amount to be determined at trial.

## COUNT XI
## ATTORNEY MALPRACTICE
### (As To Defendant Gire)

530.    The Debtor Representative repeats and realleges all prior allegations as if fully set forth herein.

531.    CCMH engaged Gire as legal counsel to provide legal advice to CCMH.

532.    Gire had an attorney-client relationship with CCMH.

533.    In performing his services as an attorney for CCMH, Gire had a legal duty to exercise the degree of learning and exercise that degree of care and skill ordinarily possessed by an attorney under similar circumstances.

534.    Gire owed all customary and professional and fiduciary duties to CCMH, including a duty not to act adversely to CCMH's interests and to refrain from taking any action, or omitting to take any action, that would result in loss, injury, damage, harm or detriment to CCMH.

535.    Gire failed to exercise the requisite level of care and skill.

536.    Gire's negligence damaged CCMH in an amount to be determined at trial.

### COUNT XII
### ATTORNEY MALPRACTICE
### (As To Defendant O&M)

537.    The Debtor Representative repeats and realleges all prior allegations as if fully set forth herein.

538.    CCMH engaged O&M as legal counsel to provide legal advice to CCMH.

539.    O&M had an attorney-client relationship with CCMH.

540.    In performing its services as an attorney for CCMH, O&M had a legal duty to exercise the degree of learning and exercise that degree of care and skill ordinarily possessed by a reputable law firm under similar circumstances.

541.    O&M owed all customary and professional and fiduciary duties to CCMH, including a duty not to act adversely to CCMH's interests and to refrain from taking any action, or omitting to take any action, that would result in loss, injury, damage, harm or detriment to CCMH.

542.    O&M failed to exercise the requisite level of care and skill.

543.    O&M's negligence damaged CCMH in an amount to be determined at trial.

### COUNT XIII
### ATTORNEY MALPRACTICE
### (As To Defendant Manning)

544.    The Debtor Representative repeats and realleges all prior allegations as if fully set forth herein.

545.    CCMH engaged Manning as legal counsel to provide legal advice to CCMH.

546.    Manning had an attorney-client relationship with CCMH.

547.    In performing his services as an attorney for CCMH, Manning had a legal duty to exercise the degree of learning and exercise that degree of care and skill ordinarily possessed by an attorney under similar circumstances.

548.    Manning owed all customary and professional and fiduciary duties to CCMH, including a duty not to act adversely to CCMH's interests and to refrain from taking any action, or omitting to take any action, that would result in loss, injury, damage, harm or detriment to CCMH.

549.    Manning failed to exercise the requisite level of care and skill.

550.    Manning's negligence damaged CCMH in an amount to be determined at trial.

### COUNT XIV
### RECHARACTERIZATION
### (As To Defendant Genesis)

551.    The Debtor Representative repeats and realleges all prior allegations as if fully set forth herein.

552.    The $4 million purported loan should properly be characterized as a capital contribution.

553.    CCMH was insolvent or inadequately capitalized when Genesis provided the $4

3594448                                    83

million purported loan.

554.    Genesis knew or should have known that CCMH was insolvent or inadequately capitalized when Genesis provided the $4 million purported loan.

555.    The purported loan was unsecured.

556.    Based on CCMH's financial condition, there was no reasonable prospect that CCMH would be able to meet its repayment obligations to Genesis as they became due.

557.    Despite the absence of a reasonable prospect of repayment by CCMH, Genesis nevertherless extended the purported loan in contemplation of ultimate acquisition of CCMH by Genesis.

558.    Based upon the foregoing, Genesis' provision of $4 million to CCMH should be recharacterized as a capital contribution.

**COUNT XV**
**EQUITABLE SUBORDINATION**
**(As To Defendant Genesis)**

559.    The Debtor Representative repeats and realleges all prior allegations as if fully set forth herein.

560.    As set forth above, Genesis managed CCMH for its own benefit, putting its own interests ahead of CCMH's in violation of its duties to CCMH under the Management Agreement.

561.    Genesis breached the Management Agreement.

562.    Genesis controlled physician recruitment at CCMH to benefit Genesis.

563.    Genesis influenced referrals and transfers of patients from CCMH to benefit Genesis.

564.    Genesis caused CCMH to retain professionals, including Bricker, who had conflicts of interest because of their relationships with Genesis.

565.    Genesis failed to implement the turnaround plan for CCMH.

566.    Genesis made poor financial decisions for CCMH, including, by causing CCMH to acquire "Cadillac" equipment and services, such as the Epic IT system, which CCMH could not afford and which were not suitable for CCMH.

567.    Genesis was actively involved in removing the going concern qualification language from CCMH's audits, as such language would have negative implications on Genesis' audits.

568.    In light of Genesis' inequitable conduct discussed above, all of which caused injury to CCMH and its creditors and conferred unfair benefits on Genesis, all of Genesis' claims against the CCMH estate should be subordinated to the claims of other unsecured creditors pursuant to 11 U.S.C. § 510(c).

569.    Equitable subordination of these claims is not inconsistent with the provisions of the Bankruptcy Code.

## COUNT XVI
## AVOIDANCE OF PREFERENCE PERIOD TRANSFERS – 11 U.S.C. § 547
### (As To Defendant Genesis)

570.    The Liquidation Trustee repeats and realleges all prior allegations as if fully set forth herein.

571.    Each Transfer constituted a transfer of an interest in property of the Debtor.

572.    Genesis was a creditor of the Debtor at the time of each Transfer, as more fully set forth on Exhibits A and B hereto.

573.    Each Transfer was to or for the benefit of Genesis, as a creditor, within the meaning of 11 U.S.C. § 547(b)(1) because each Transfer either reduced or fully satisfied a debt or debts then owed by the Debtor to Genesis.

574.    Each Transfer was made for, or on account of, an antecedent debt or debts owed

by the Debtor to Genesis before such Transfers were made, each of which constituted a "debt" or "claim" (as those terms are defined in the Bankruptcy Code).

575.     Each Transfer was made while the Debtor was insolvent.  Among other things, as evidenced by the Debtor's Schedules filed in the Chapter 11 Case, as well as the proofs of claim that have been received to date, the Debtor's liabilities exceeded its assets on the Petition Date.

576.     Each Transfer was made during one of the Preference Periods.

577.     As a result of each Transfer, Genesis received more than Genesis would receive if:  (i) this case was under chapter 7 of the Bankruptcy Code; (ii) the Transfers had not been made; and (iii) Genesis received payments of its debts under the provisions of the Bankruptcy Code.  This is evidenced by the fact that unsecured creditors, under the Plan, have received or will receive less than the full amounts they are owed.

578.     Based on the foregoing, each Transfer is voidable pursuant to 11 U.S.C. § 547(b).

**COUNT XVII**
**AVOIDANCE OF FRAUDULENT TRANSFERS – 11 U.S.C. § 548**
**(As To Defendant Genesis)**

579.     The Liquidation Trustee repeats and realleges all prior allegations as if fully set forth herein.

580.     Upon information and belief, CCMH made periodic interest payments to Genesis on the $4 million purported loan (the "Purported Interest Payments").

581.     As the $4 million purported loan should properly be characterized as a capital contribution, CCMH should not have paid the Purported Interest Payments to Genesis.

582.     Upon information and belief, CCMH was insolvent on the date that it made some or all of the Purported Interest Payments.

583.     CCMH received less than reasonably equivalent value in exchange for the Purported Interest Payments.

584.    Any Purported Interest Payments made within two years before the petition date—June 30, 2014, are voidable pursuant to 11 U.S.C. § 548(a).

### COUNT XVIII
### AVOIDANCE OF FRAUDULENT TRANSFERS – 11 U.S.C. § 548
### (As To Defendant Genesis)

585.    The Liquidation Trustee repeats and realleges all prior allegations as if fully set forth herein.

586.    Section 2.1.2 of the Management Agreement provides that the Executive Management Group personnel may, in certain circumstances, be part-time in nature and that the individuals serving in these capacities may serve in other capacities on behalf of Genesis.

587.    To the extent any member of the Executive Management Group served in other capacities on behalf of Genesis while simultaneously working at CCMH, CCMH was not responsible for reimbursing Genesis for the portion of the Executive Management Group member's salary or expenses incurred while performing work for Genesis (the "Genesis Salary Payment").

588.    Section 2.1.3 of the Management Agreement provides that in the event an Executive Management Group member is removed by Genesis at the request of CCMH, or if the Agreement is terminated by CCMH pursuant to section 8.2, or by Genesis pursuant to section 8.2 or 8.3, then CCMH shall be responsible for paying all direct severance costs and expenses incurred by Genesis on account of Genesis terminating the employment of any Executive Management Group member.

589.    To the extent any member of the Executive Management Group served in other capacities on behalf of Genesis while simultaneously working at CCMH, CCMH was not responsible for paying severance costs and/or expenses for the portion of the Executive Management Group member's severance costs and/or expenses incurred while performing work

for Genesis (the "<u>Genesis Severance Payment</u>," and together with the Genesis Salary Payment, the "<u>Genesis Payments</u>").

590.　Upon information and belief, CCMH was insolvent on the date that it made some or all of the Genesis Payments.

591.　CCMH received less than reasonably equivalent value in exchange for the Genesis Payments.

592.　Any Genesis Payments made within two years before the petition date—June 30, 2014, are voidable pursuant to 11 U.S.C. § 548(a).

**COUNT XIX**
**RECOVERY OF AVOIDED TRANSFERS – 11 U.S.C. § 550**
**(As To Defendant Genesis)**

593.　The Liquidation Trustee repeats and realleges all prior allegations as if fully set forth herein.

594.　The Debtor Representatives is entitled to avoid the Transfers pursuant to 11 U.S.C. § 547(b) and the Purported Interest Payments and Genesis Payments pursuant to U.S.C. § 548(a) (together, the "<u>Avoidable Transfers</u>").

595.　Genesis was the initial transferee of the Avoidable Transfers or the immediate or mediate transferee of such initial transferee or the person for whose benefit the Avoidable Transfers were made.

596.　Based upon the foregoing, the Liquidation Trustee is entitled to recover the Avoidable Transfers, or the value thereof, from Genesis under 11 U.S.C. § 550(a), together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action.

## COUNT XX
## DISALLOWANCE OF ALL CLAIMS – 11 U.S.C. § 502(d)
### (As To Defendant Genesis)

597.     The Liquidation Trustee repeats and realleges all prior allegations as if fully set forth herein.

598.     Genesis is a transferee of transfers avoidable under sections 547 and 548 of the Bankruptcy Code, which property is recoverable under section 550 of the Bankruptcy Code.

599.     Genesis has not satisfied its liability for the Avoidable Transfers.

600.     Pursuant to section 502(d) of the Bankruptcy Code, any and all claims of Genesis and/or its assignee against Plaintiff must be disallowed until such time as Genesis pays Plaintiff an amount equal to the Avoidable Transfers, plus interest thereon and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests entry of a final judgment against Defendants as follows:

A.     On Count I, awarding damages against Genesis in an amount to be determined at trial, for breach of contract; and

B.     On Count II, awarding damages against Genesis in an amount to be determined at trial, for breach of duty; and

C.     On Count III, awarding damages against Perry in an amount to be determined at trial, for breach of duty; and

D.     On Count IV, awarding damages against Miller in an amount to be determined at trial, for breach of duty; and

E.     On Count V, determining that the unlawful conduct, contract or combination alleged herein be adjudged and decreed (i) a *per se*  violation of Section 1 of the Sherman Act; or (ii) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act

3594448

and reviewed under a Rule of Reason analysis; and

F.      On Counts VI and VII, determining that the unlawful conduct, contract or combination alleged herein be adjudged and decreed a monopoly, attempted monopoly or combination in restraint of trade in violation of Section 2 of the Sherman Act; and

G.      On Count VIII, determining that the unlawful conduct, contract or combination alleged herein be adjudged and decreed an unlawful combination, contract, trust, agreement, understanding and/or concert of action in violation of Ohio's antitrust statute, the Valentine Act; and

H.      On Count V, VI, VII and VIII awarding damages against Genesis and Perry to the maximum extent allowed under the law and entering a joint and several judgment in favor of Plaintiff against Genesis and Perry  in an amount to be trebled to the extent permitted by law; and

I.      On Count IX, awarding damages against Blue in an amount to be determined at trial, for professional negligence; and

J.      On Count X, awarding damages against Bricker in an amount to be determined at trial, for attorney malpractice; and

K.      On Count XI, awarding damages against Gire in an amount to be determined at trial, for attorney malpractice; and

L.      On Count XII, awarding damages against O&M in an amount to be determined at trial, for attorney malpractice; and

M.      On Count XIII, awarding damages against Manning in an amount to be determined at trial, for attorney malpractice; and

N.      On Count XIV, entering a declaratory judgment recharacterizing Genesis'

purported loan to CCMH as a capital contribution; and

      O.      On Count XV, subordinating Genesis' claims to the claims of unsecured creditors; and

      P.      On Counts XVI, XVII, XVIII and XIX, awarding judgment in favor of Plaintiff and against Genesis, (i) avoiding all of the Avoidable Transfers, (ii) directing Genesis to return to Plaintiff the amount of the Avoidable Transfers, pursuant to 11 U.S.C. §§ 547(b), 548(a), and/or 550(a), and (iii) for money damages against Genesis in the amount of the Avoidable Transfers, together with interest from the date of demand at the maximum legal rate, to the extent allowed by law; and

      Q.      On Count XX, awarding judgment in favor of Plaintiff and against Genesis disallowing any claims held or filed by Genesis against the Plaintiff until Genesis pays Plaintiff an amount equal to the Avoidable Transfers pursuant to 11 U.S.C. § 502(d); and

      R.      Awarding attorneys' fees to the extent permitted by law, including as set forth in Fed. R. Bankr. P. 7008(b); and

      S.      Awarding interest and cost of suit; and

   T.  Awarding such other relief as the Court deems just and equitable.

Dated:  April 3, 2018

          /s/ *Nathaniel R. Sinn*
          Nathaniel R. Sinn (0088467)
          Matthew Matheney
          Buckingham, Doolittle & Burroughs, LLC
          1375 E. 9th Street, Suite 1700
          Cleveland, OH 44114
          Telephone: 216.621.5300
          Facsimile:  216.615.3021
          Email: nsinn@bdblaw.com
            mmatheney@bdblaw.com

          - and –

          Andrew H. Sherman (*pro hac vice*
          admission to be requested)
          Boris I. Mankovetskiy (*pro hac vice*
          admission to be requested)
          Sills Cummis & Gross P.C.
          One Riverfront Plaza
          Newark, NJ 07102
          Telephone:  973-643-7000
          Facsimile:  973-643-6500
          Email:  asherman@sillscummis.com
          bmankovetskiy@sillscummis.com

          COUNSEL FOR THE LIQUIDATION
          TRUSTEE