UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CH LIQUIDATION ASSOCIATION LIQUIDATION TRUST, *et al.*, | ) ) ) | Case No.: 5:18 CV 752 |
| Plaintiffs | ) ) | |
| v. | ) ) | JUDGE SOLOMON OLIVER, JR. |
| GENESIS HEALTHCARE SYSTEM, *et al.*, | ) ) ) ) | |
| Defendants | ) | <u>ORDER</u> |

Currently pending before the court in the above-captioned case is Defendant Blue & Co.'s Motion to Dismiss Count IX of the Complaint ("Motion") (ECF No. 23). For the following reasons, the court denies Blue's Motion.

**I. BACKGROUND**

In the aftermath of the financial collapse of Coshocton Memorial Hospital Association ("CCMH"), Plaintiff CH Liquidation Association Liquidation Trust and Joseph Oriti, in his capacity as Debtor Representative and Liquidation Trustee of the estate of CCMH ("Plaintiff"), filed a Complaint seeking redress for the injuries allegedly caused by eight Defendants (ECF No. 1). Plaintiff claims, among other things, that Defendants' misconduct led CCMH to file for chapter 11 protection and/or deepened CCMH's insolvency. (Compl. ¶ 7.) Count IX of the Complaint names Defendant Blue & Co. ("Blue"), claiming accountant and professional malpractice in the conduct of audits performed for CCMH for the years 2012 and 2013. (*Id*. ¶¶ 514–22.)

**A. Factual Background**

Coshocton Memorial Hospital Association operated a general acute care not-for-profit hospital in Coshocton, Ohio, as well as a number of primary care and specialty physician clinics. (*Id*.

¶15.) As early as fall 2008, at a time of financial difficulty for CCMH and other rural hospitals, CCMH began a complicated relationship with Genesis Healthcare System ("Genesis"), a healthcare provider located in the same region as CCMH. Although the relationship would start with the CEO of Genesis and the CEO of CCMH each serving as equals on a three-member not-for-profit healthcare alliance board, Genesis would later control the decisions of CCMH pursuant to a Management Agreement executed in 2012. (*Id.* ¶¶ 57–64, 90–121.) Eventually, the relationship ended when CCMH filed for chapter 11 protection in 2016.

Plaintiff's twenty-count Complaint arises from the CCMH-Genesis relationship. In the Complaint, Plaintiff alleges a range of anti-trust and tort claims against CCMH's executive leadership, Genesis' executive leadership, their respective legal counsel, and, most relevant to this pending Motion, CCMH's financial auditor Blue & Co. Plaintiff claims that Blue committed accountant and professional malpractice when Genesis influenced it to remove the following language from its audit of CCMH's 2012 and 2013 financial statements:

> The accompanying consolidated financial statements have been prepared assuming [CCMH] will continue as a going concern. As discussed in Note 4 to the consolidated financial statements, [CCMH] did not meet certain covenants related to the debt outstanding at December 31, 2013. The bank may demand repayment of the related debt, though no such demand has been made. In addition, [CCMH] had overdrawn their cash and cash equivalents as of December 31, 2013 and the 1999 Revenue Bonds letter of credit expires on September 15, 2014 resulting in the associated debt to be classified as current. These conditions raise substantial doubt about its ability to continue as a going concern. The financial statements do not include any adjustments that might result from the outcome of this uncertainty. Our opinion is not modified with respect to this matter.

(*Id.* ¶¶ 300–312.) This language, known as a going concern qualification, is required when information from the audit would lead an auditor to have substantial doubt that the company can

continue for a year from the end of the period of the financial statement being audited. (Reply at 3, ECF No. 50.) Plaintiff claims that as a result of pressure from Genesis, Blue removed the going concern qualifications. (Compl. ¶ 310.) In so doing, Plaintiff alleges that Blue failed to maintain an independent opinion, and made material omissions in the audit report in violation of professional auditing standards. (*Id*. ¶¶ 515–22.) Because of the omitted language, Plaintiff states that CCMH was able to obtain waivers and extensions of letters of credit. (*Id*. ¶¶ 310, 521.) Plaintiff argues that the ability to receive credit and secure bonds, however, only prolonged CCMH's inevitable collapse and deepened CCMH's insolvency. (*Id*. ¶ 311.)

### B. Procedural History

On June 30, 2016, CCMH filed its voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Ohio. (*Id*. ¶ 30.) CCMH continued to operate as debtor-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108 after the Petition Date. (*Id*. ¶¶ 30–31.) On October 3, 2016, the Bankruptcy Court entered an order approving CCMH's sale of substantially all of its assets, and the sale transaction closed on October 31, 2016. (*Id*. ¶¶ 32–33.) On July 12, 2017, the Bankruptcy Court confirmed the Chapter 11 plan (the "Plan"), and the Plan became effective on August 1, 2017. (*Id*. ¶¶ 34, 36.) Plaintiff filed the Complaint in the present action on April 3, 2018. On July 20, 2018, Blue filed the pending Motion to Dismiss, arguing that: (1) the terms of the audit engagement letters between Blue and CCMH barred Plaintiff from bringing the claim against Blue; (2) the res judicata effect of the Plan barred Plaintiff from bringing the claim against Blue; and (3) Plaintiff failed to plead a plausible claim for relief. Plaintiff submitted a Response on July 6, 2018, and Blue replied on June 8, 2018 (ECF Nos. 44, 50).

## II. LEGAL STANDARD

The United States Supreme Court clarified the law regarding what a plaintiff must plead in order to survive a motion made pursuant to Rule 12(b)(6) in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and in *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009).When determining whether the plaintiff has stated a claim upon which relief can be granted, the court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. The plaintiff's obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. Even though a complaint need not contain "detailed" factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the Complaint are true." *Id.* A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

The Court, in *Iqbal*, further explained the "plausibility" requirement, stating that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 556 U.S. at 678. Furthermore, "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* This determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## III. LAW AND ANALYSIS

**A. Engagement Letters Do Not Compel Mediation or Time Bar**

Blue first argues that Plaintiff has failed to state a claim upon which relief can be granted because of the restrictive terms of the 2012 and 2013 audit engagement letters ("Engagement Letters" or "Letters"). The Engagement Letters, which "confirm an understanding of the services" that Blue would provide for CCMH's 2012 and 2013 audits, state that disputes "arising out of this agreement" must be commenced within one year of the delivery of the work product. (Mot. Exhs. 1, 2, ECF Nos. 23-1, 23-2.) The Letters also state that "[i]f a dispute arises out of or relates to this engagement letter . . . the parties agree first to try in good faith to settle the dispute by mediation administered by the American Arbitration Association . . . before resorting to arbitration, litigation, or some other dispute-resolution procedure." (*Id.*) Blue delivered the 2012 Audit Report to CCMH on July 15, 2013, and delivered the 2013 Audit Report to CCMH on September 24, 2014. (Mot. 13, ECF No. 23.) Since Plaintiff filed the Complaint on April 3, 2018, Blue argues that Plaintiff is time-barred from bringing the malpractice claim against Blue (*Id.*) In addition, Blue contends that Plaintiff is bound by the mediation provision of the Engagement Letters. (*Id*. at 15.) Thus, in the event that the court does not dismiss the claims therein, Blue asserts that the court must compel Plaintiff to proceed with mediation and stay the claim against Blue, or dismiss the claim without prejudice pending the completion of mediation. (*Id*.) However, Plaintiff argues that its claim is not subject to the terms of the engagement letters because the malpractice claim does not "arise out of" the contract. (Opp'n 3, ECF No. 44.) Instead, Plaintiff asserts that the malpractice claim is an independent tort cause of action arising under Ohio law. (*Id*. at 4.)[1]

---

[1]  Since Plaintiff did not expressly discuss the Engagement Letters in the Complaint, parties dispute whether the court should consider the Letters in this Motion to Dismiss or whether the court should convert Defendant's Motion to one of summary judgment pursuant to Federal Rule of Civil

For the following reasons, the court finds that Plaintiff's claim is not subject to the terms of the Engagement Letters. Upon finding that Plaintiff is not bound by the Letters, the court finds that Plaintiff is not required to engage in mediation before pursuing its claims in this court. Additionally, the contractually shortened statute of limitations is not applicable to Plaintiff's malpractice claim. In applying the appropriate statute of limitations for a professional malpractice claim and Section 108 of the Bankruptcy Code, the court finds that Plaintiff's claim is not time-barred.

*1. Claim Is Not Related to Engagement Letters*

In order to determine whether the mediation provision and the shortened statute of limitations apply, the court first examines the applicability of the terms of the Engagement Letters to Plaintiff's claim.

Accountant malpractice claims are governed by Section 2305.09(D) of the Ohio Revised Code, which states, in relevant part, that "an action . . . shall be brought within four years after the cause thereof accrued . . . for an injury to the rights of the plaintiff not arising on contract." *Inv'rs REIT One v. Jacobs*, 546 N.E.2d 206, 209–10 (Ohio 1989). A tort claim may be asserted independently if "an action could be maintained without reference to the [contract]." *Acad. of Med. v. Aetna Health, Inc.*, 842 N.E.2d 488, 495 (Ohio 2006) (noting that this is the proper analysis in determining whether an arbitration agreement should apply to a tort claim). On the other hand, when

---

Procedure 12(d). As discussed below, Defendant has raised a legal argument that the claim is based in contract, and that the contract's terms preclude Plaintiff's malpractice claim. However, Plaintiff argues that the claim is based in tort, and the parties need not be bound to the terms of the Letters in litigating this claim. Having reviewed Defendant's argument, the court has made a determination, based in law and without requiring further factual inquiry, that Plaintiffs have stated a claim upon which relief can be granted. Thus, it is not necessary to convert the Motion to one of summary judgment in order to provide parties the opportunity to develop factual arguments, to resolve the question of whether Plaintiff's claim arises out of contract.

the underlying claims, "touch matters" covered by the contract, the cause of action is based upon the contract. *Id*. at 494, 495 (citing *Genesco, Inc. v. T. Kakluchi & Co., Ltd.*, 915 F.2d 840, 846 (2d Cir. 1987)).

Blue contends that two cases support its argument that the malpractice claim arises out of the Engagement Letters. (Reply 12–13, ECF No. 50.) In *Alexander v. Wells Fargo Financial*, a mortgagor and a debtor brought class actions, which were subsequently consolidated, alleging that mortgagees and creditors failed to file entries of satisfaction within the statutorily required period of time for mortgages and debts paid. 911 N.E.2d 286, 287–88 (Ohio 2009). The issue before the Ohio Supreme Court was whether the plaintiffs were subject to the arbitration agreements within the mortgage and loan contracts. The Ohio Supreme Court first analyzed whether the claims were based on the contractual terms or whether the claims could be maintained independent of the contracts. *Id*. at 289–90. The court found that the plaintiffs' claims could not "be maintained without reference to the contract or relationship at issue." *See id.* at 290. Because the plaintiffs would have been required to reference the contracts "to demonstrate that the mortgage agreement was entered into and satisfied and that the statement of satisfaction was not timely filed under R.C. 5301.36," the claims were based on the terms of the contract. *Id*. Therefore, the arbitration clauses in the contracts also applied to the plaintiffs' claims. Blue also cites to *Natale v. Frantz Ward L.L.P.*, an Eighth District Ohio Court of Appeals case in which a law firm partner filed a complaint against the partnership and others, alleging a claim for intentional infliction of emotional distress after he was unsuccessful in receiving disability retirement benefits from his firm. 110 N.E.3d 829, 830 (Ohio Ct. App. 2018). The court in *Natale* also examined whether to compel arbitration based on the terms of the partnership agreement. *Id*. at 831–32. As in *Alexander*, the court first considered whether the contract was the basis for the plaintiff's claim or whether the claim could be maintained independently. *Id*.

The court found that the claim "touched matters" covered by the partnership agreement, such as the retirement plan and benefits, and noted that the plaintiff even expressly referenced some of the terms of the partnership agreement in the complaint. *Id.* Because the court would have had to refer to the contract at issue "to understand the facts underlying [the plaintiff's] claim," the court found that the claim fell within the scope of the contract, and the claim must be arbitrated. *Id*. at 832.

Blue maintains that Plaintiff's claim is similar to those in *Alexander* and *Natale* because "there is no way to evaluate a tort claim without evaluating the Engagement Letters." (Reply at 13.) In particular, Blue points to the sections of the Letters that detail Blue's responsibilities to communicate certain matters to CCMH's board of trustees. (*Id*.) But unlike in *Alexander* and *Natale*, it is not necessary for Plaintiff to reference, or for the court to consider, the Engagement Letters to understand and analyze Plaintiff's malpractice claim. The plaintiff in *Natale* referenced components of the partnership agreement in his complaint to make out the elements of an intentional infliction of emotional distress claim. *Natale*, 110 N.E.3d at 831. Similarly, the claims in *Alexander*, that the defendants were statutorily required to act within a certain time period, were based on the defendants' alleged duties in the mortgage and loan agreements. *Alexander*, 911 N.E.2d at 290. In contrast, Plaintiff's claim relates to Blue's obligation to abide by professional conduct standards, as discussed *infra*, not any contractual duty imposed by the terms of the Engagement Letters. Thus, Plaintiff need not rely on the content of the Engagement Letters to plead elements of the malpractice claim.

Plaintiff argues that *Taylor v. Ernst & Young, L.L.P.* is more comparable. 958 N.E.2d 1203 (Ohio 2011). In *Taylor*, the Ohio Supreme Court determined that a professional negligence claim against a financial auditor could be maintained as a cause of action independent of the terms of an engagement letter. *Id*. at 1214. The court gave two reasons. First, the court found that the malpractice

claim "does not seek a declaration of a signatory's rights and obligations under the engagement." *Id*. Second, the court reasoned that the claim arises from the powers given by the General Assembly to the liquidator, which in this case was the Ohio Superintendent of Insurance.

Blue asserts that *Taylor* is distinguishable because it involves statutory claims, and arises out of statutory and regulatory duties. (Reply at 13–14.) Although the court agrees that there is a factual difference between the claim in *Taylor*, which is based on duties by statute, and the present case, which alleges duties imposed by a professional standard of care, both cases are similar in that the source of the alleged tort is some duty that arises out of something other than a contract. Most relevant to the present inquiry is the *Taylor* court's finding that the plaintiff liquidator "did not request or require the court to interpret the engagement letter to determine [the defendant's] obligations to [the insolvent company]." *Taylor*, 958 N.E.2d at 1214–15. Because the alleged harm to Plaintiff can be traced to duties not referenced in the Engagement Letters, the court finds that Plaintiff's claim does not arise from the Engagement Letters.

*2. Mediation Provision and Shortened Statute of Limitations Are Inapplicable*

Having found that Plaintiff's claim does not arise out of the Engagement Letters, the court finds that Plaintiff is not compelled to mediate the claim. In addition, the court finds that the Engagement Letter provision to shorten the statute of limitations to one year following the delivery of the work product is inapplicable to the malpractice claim. Therefore, the statute of limitations for accountant malpractice of four years shall apply. Ohio Rev. Code Ann. § 2305.09(D) (2017); *see also Inv'rs REIT One v. Jacobs*, 546 N.E.2d 206, 209–10 (Ohio 1989). Accordingly, the statute of limitations should run on the 2012 and 2013 audit reports on July 15, 2017 and September 24, 2018, respectively.

-9-

However, Plaintiff argues that Section 108 of the Bankruptcy Code is also applicable to this claim. (Opp'n at 27.) Section 108(a) of the Bankruptcy Code states that if the period in which a debtor may commence an action has not expired before the date of the filing of the bankruptcy petition, the trustee of the estate "may commence such action only before the later of (1) the end of such period . . . or; (2) two years after the order for relief." *See also* 11 U.S.C. § 301(b) (noting that the date of the order of relief is based on the date a voluntary bankruptcy petition is filed). Plaintiff filed the voluntary bankruptcy petition on June 30, 2016. Since the four-year statute of limitations had not run on either the 2012 or 2013 audit reports at that time, the court agrees with Plaintiff that Section 108 of the Bankruptcy Code should apply here. Therefore, Plaintiff was required to commence the action regarding the 2012 audit report by June 30, 2018, and the 2013 audit report by September 24, 2018. Because Plaintiff filed the Complaint regarding both audits on April 3, 2018, Plaintiff is not time-barred from bringing the malpractice claim against Blue.

**B. Res Judicata Does Not Bar Plaintiff's Claims**

Blue argues that the res judicata effect of the bankruptcy Plan bars Plaintiff from bringing the malpractice claim. (Mot. at 7.) A claim is barred by res judicata if there is "(1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the same parties or their privies; (3) an issue in the subsequent action which was litigated or which should have been litigated in the prior action; and (4) an identity of the causes of action." *Browning v. Levy*, 283 F.3d 761, 771–72 (6th Cir. 2002). Plaintiff does not dispute that the claim meets the elements of res judicata, but argues instead that the claim may be litigated because it was preserved in the Plan. *In re Mt. Glacier LLC*, 877 F.3d 246, 248 (6th Cir. 2017) (recognizing that res judicata does not apply if the debtor expressly retained an existing claim for post-bankruptcy litigation); *Browning*, 283 F.3d

at 774 (same). Blue disputes that Plaintiff has specifically and adequately preserved the claim. (Reply at 17–18.)

In *Browning v. Levy*, the United States Court of Appeals for the Sixth Circuit determined that a debtor had insufficiently preserved claims of malpractice and breach of fiduciary duty in their bankruptcy plan, and was thus barred by res judicata from litigating the claims. 283 F.3d at 766. In reading this decision, the court rejected the debtor's argument that an "omnibus reservation of rights" should be sufficient to preserve the claims.[2] The *Browning* court found that the blanket reservation was insufficient because "it did not enable the value of [plaintiff's] claims to be taken into account in the disposition of the debtor's estate." *Id*. at 775. In addition, "it neither names [the defendant] nor states the factual basis for the reserved claims." *Id.* A similar issue was before the Sixth Circuit in *In Re Mountain Glacier, LLC*, 877 F.3d 246 (6th Cir. 2017). However, the Sixth Circuit ruled in favor of the debtor in *In Re Mountain Glacier*, finding that the debtor had adequately reserved a right to pursue counterclaim. *Id*. at 250. The Sixth Circuit found that *Browning* "does *not* require a debtor's reservation of claims to name each (potential) defendant and state the factual basis for each (potential) cause of action." *Id*. at 249. Instead, the Sixth Circuit held that "a debtor's reservation is sufficient so long as it enables creditors to (1) identify the claims (or potential claims) at issue and (2) to evaluate whether those claims might provide additional assets for distribution." *Id*. (citing *Browning*, 283 F.3d at 774–75); *see also Harstad v. First Am. Bank*, 39 F.3d 898, 903 (8th Cir. 1994) (noting that the purpose of stating potential claims in the bankruptcy plan is to "ensure creditors know about claims that might enlarge the estate"). Because the debtor identified the

---

[2] The provision in dispute read: "In accordance with section 1123(b) of the Bankruptcy Code, the Company shall retain and may enforce any claims, rights, and causes of action that the Debtor or its bankruptcy estate may hold against any person or entity, including, without limitation, claims and causes of action arising under sections 542, 543, 544, 547, 548, 550, or 553 of the Bankruptcy Code." *Browning*, 283 F.3d at 769.

-11-

counterparty and indicated the forum, the Sixth Circuit determined that it had sufficiently preserved the right to pursue counterclaim such that creditors "knew that there was an ongoing claim and a potential recovery." *In Re Mountain Glacier*, 877 F.3d at 249.

Although CCMH's Plan includes a blanket reservation, the Plan also contains statements that preserve tort claims with more specificity. For instance, Section 1.1.22 of the Plan specifically preserves "all Tort Claims," which Section 1.1.106 of the Plan defines, in part, to include "professional negligence claims." (Opp'n at 6.) In addition, Sections 1.1.76, 6.3, 6.4, 7.3.1 of the Plan refer to proceeds from future tort claims and outline how proceeds from those claims will go toward repayment of debts. (*Id*. at 6–7.) Thus, the present case is unlike *Browning* where the debtor's preservation arguments rested only on a blanket statement. Although Plaintiff in this case does not name a specific defendant like the debtor did in *In Re Mountain Glacier*, Plaintiff expressly reserved tort claims, and anticipated professional negligence claims specifically. The Plan also included information about how the proceeds from future litigation would be allocated. Thus, the court finds that creditors would have had enough information to know that there would be potential professional negligence claims and potential recovery. Accordingly, res judicata does not preclude Plaintiff from bringing the malpractice claim against Blue.

### C. Complaint is Well-Pled

In an action for professional negligence, a plaintiff must establish the existence of a legal duty, a breach of that duty, causation, and injury or damages. *See Second Nat'l Bank of Warren v. Demshar*, 707 N.E.2d 30, 32 (Ohio 1997). In cases involving "the exercise of professional skill and judgment, expert testimony is required to establish the prevailing standard of care, a breach of that standard, and proximate cause." *Chilton-Clark v. Fishel*, No. 16AP-76, 2016 WL 5639615, at *5 (Ohio Ct. App. 2016) (quoting *Ullman v. Duffus*, No. 05AP-299, 2005 WL 3047433, at *4–5 (Ohio

Ct. App. 2005)). Blue argues that Plaintiff has not made out the elements to factually support a plausible professional malpractice claim. (Mot. at 16.) Plaintiff disagrees.

In regard to the elements of duty and breach, the court finds that Plaintiff has sufficiently pled factual allegations to show that Blue had a duty to exercise independent judgment, and Blue breached that duty, thus allegedly misrepresenting CCMH's financial situation in the audits. First, Plaintiff notes that Blue is a professional association of certified public accountants, and it establishes that Blue had a duty to abide by generally accepted accounting standards. (Compl. ¶ 22, 515.) Plaintiff states that this includes a duty to exercise independent judgment. (*Id.* ¶ 517.) *Cf. Fehrbach v. Ernst & Young,* LLP, 493 F.3d 905, 911 (7th Cir. 2007) ("If the auditor is told by the firm or otherwise learns from the information that it collects in conducting the audit that the firm's near term prospects are endangered by pending legislation, the loss of a customer, or other 'conditions or events,' then it must factor the information into its assessment of the firm's risk of going under within one year."). Second, Plaintiff cites to several e-mail exchanges between Genesis executives, CCMH executives, and representatives from Blue expressing uneasiness over the going concern language in the draft audits. (Compl. ¶¶ 297–307, 309.) These statements included plans to urge Blue to change or remove the qualifications. (*Id.* ¶¶ 299, 301, 309.) Third, Plaintiff states that the language was removed from Blue's audit reports after Genesis' CEO arranged for a call with Blue to discuss this particular issue and a conference call with Blue, Chase, CCMH, and Genesis took place. (*Id.* ¶¶ 302–307.) Finally, Plaintiff points to additional e-mail exchanges between Genesis and CCMH executives congratulating one another for being able to "get the going concern language removed." (*Id.* ¶ 309.) The court finds that these statements are sufficient factual allegations to support the elements of duty and breach.

However, Blue argues that "there are no facts alleged that support the notion that such removal was not correct as a matter of the prevailing standard of care, or that the prevailing standard of care required that such a warning be given." (Mot. at 17–18.) Blue contends that the fact that CCMH continued to operate after the one-year period that was the subject of the going concern qualifications shows that Blue did not have a duty to include the qualifications. (*Id.* at 18.) At the root of Blue's arguments is its defense that it did not breach any duty because the audits were accurate. Whether the audits were accurate without the going concern qualifications raises a factual issue that is inappropriate for resolution at this stage. *See Staph v. Sheldon*, No. 91619, 2009 WL 94545, at *3 (Ohio 2009); *see also Ullman v. Duffus*, No. 05AP-299, 2005 WL 3047433, at *4–5 (Ohio Ct. App. 2005). At this time, the court finds that Plaintiff's previously discussed factual allegations that Blue's omission of the going concern qualifications misrepresented Blue's finances in the audits is sufficient to support the claim that Blue owed a duty to CCMH and Blue breached that duty.

Next, the court turns to the elements of causation and injury or damages. Cause in fact "requires that the harmful result would not have come about but for the defendant's negligent conduct. . . . On the other hand, legal cause or 'proximate cause' normally involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences." *In re NM Holdings*, 622 F.3d 613, 618–19 (6th Cir. 2010) (interpreting Michigan professional negligence law) (citations omitted) [hereinafter *NM Holdings*].

Plaintiff alleges that Blue's removal of the going concern language caused the CCMH board and CCMH's creditors to make decisions that adversely affected CCMH. (Opp'n at 29.) Specifically, Plaintiff states that "Blue's failure [to] exercise reasonable skill, diligence or knowledge in auditing CCMH's financial statements for 2012 and 2013 caused CCMH damage by, among other things,

misrepresenting CCMH's financial condition to the CCMH Board and its creditors and enabling CCMH to continue to operate." (Compl. ¶ 81.) Furthermore, Plaintiff claims that in continuing operations, CCMH incurred expenses and purchased inventory that it was not able to afford, which ultimately injured CCMH by deepening its insolvency. (Opp'n at 29–30.)

Blue contends that Plaintiff pleads only conclusory statements, thereby insufficiently demonstrating causation. Blue argues that Plaintiff cannot show causation because Plaintiff did not show that CCMH and its creditors relied on the audit reports to make decisions that were ultimately adverse to CCMH's financial situation. (Mot. at 21–22.) Blue also maintains that Plaintiff could not have relied on the audit reports because Plaintiff had access to its own financial statements and, therefore, had sufficient knowledge of CCMH's dire financial situation. (*Id*. at 19–21.) In addition, Blue asserts that even if Plaintiff plausibly claims that CCMH's creditors relied on the audit in extending the letters of credit, that does not satisfy a showing of reliance. Blue explains that in cases where the defendant's former client brings the malpractice claim, the plaintiff must show that the plaintiff, not a third party, relied on the defendant's allegedly negligent actions, which ultimately caused injury to the plaintiff. (Mot. at 21–22; Reply at 9–11.)

Blue is correct that reliance is an important aspect of showing cause in fact. *See In re NM Holdings*, 622 F.3d at 619 ("[R]eliance is not a per se element of professional negligence, [but] proof of reliance is necessary here in order to show that [the defendant's] allegedly deficient audits were the cause in fact of [the debtor's] tenuous financial position and resulting bankruptcy."); *FDIC v. Ernst & Young,* 967 F.2d 166, 170 (5th Cir. 1992) (noting that "if nobody relied upon the audit, then the audit could not have been a 'substantial factor in bringing about the injury'") (internal citation omitted). However, Blue misstates the resulting harm in this case for which Plaintiff must plead reliance on the audits.

-15-

Defendant relies on *NM Holdings*, a case that establishes the notion that when the plaintiff is a former client of the defendant auditor, the plaintiff must have relied on the audit themselves. In *NM Holdings*, the trustee in bankruptcy for a group of companies known as Venture, sued Venture's former auditor alleging professional negligence under Michigan law for failing to uncover and report unsound related-party transactions entered into by Venture's sole shareholder and CEO. 622 F.3d at 615. The court granted the defendant's motion to dismiss, finding that the plaintiff was required, but failed, to show that Venture, and not third-party creditors, relied on the audit. *Id.* at 625. In other words, the plaintiff needed to show Venture itself relied on the audits to learn about unsound transactions because the plaintiff was alleging harm resulting from the lack of knowledge of these transactions.

However, the claim before this court is not about the discovery of unsound transactions or the discovery of Plaintiff's financial situation, as was the case in *NM Holdings*. The alleged negligence in this case is the failure to issue an independent opinion in an audit report, and the alleged resulting harm is CCMH's use of the audit to make decisions, such as requesting and receiving extensions of letters of credit or foregoing an immediate search for purchasers, which injured CCMH by artificially prolonging its operations and unnecessarily deepening its insolvency. (Compl. ¶ 521.) Therefore, Blue's argument that CCMH provided financial statements for Blue to audit, and therefore, CCMH could not have relied on the audits to learn of its own dire finances is irrelevant. Consequently, and in keeping with the principle in *NM Holdings* that causation must be linked to the harm alleged, the court finds that Plaintiff is required to show CCMH, not only third-party creditors, relied on the auditor's professional opinion to exclude the going concern language to make financial decisions it would not have made had the going concern language been included in the audit.

Plaintiff states that Blue's negligence "caused" CCMH damage by . . . misrepresenting CCMH's financial condition to the CCMH Board and its creditors" and this "enabl[ed] CCMH to continue to operate by incurring expenses and purchasing inventory that it was unable to afford." (*Id.* ¶ 521.) Plaintiff also maintains that the removal of the going concern qualifications "enabled CCMH to obtain waivers and extensions of letters to credit issued by Chase [a creditor] securing CCMH bonds." (*Id.* ¶ 310.) Although Plaintiff points to the creditor's reliance on the audit in other parts of the Complaint and in Plaintiff's Memorandum in Opposition (*E.g.*, *id.* ¶ 522; Opp'n at 30–31), Plaintiff's statement here indicates that CCMH itself used the audit reports that excluded the going concern language to obtain credit. Furthermore, Plaintiff notes that had Chase not secured those bonds, CCMH would have defaulted on the bonds and the bond trustee would have exercised remedies. (Compl. ¶ 311.) Plaintiff states that this "would have likely led to a restructuring or sale of CCMH at least two years before the Petition Date." (*Id.* ¶ 312.) The court finds that these statements are sufficient to show causation.

Finally, Blue takes issue with Plaintiff's characterization of its alleged injury and damages. Plaintiff claims that Blue's actions injured CCMH by deepening its insolvency. (*Id.* ¶¶ 312, 521.) This theory "allows damages sometimes to be awarded to a bankrupt corporation that by delaying liquidation ran up additional debts that it would not have incurred had the plug been pulled sooner." *Fehrbach v. Ernst & Young, LLP*, 493 F.3d 905, 908 (7th Cir. 2007). However, Blue contends that "deepening insolvency" is not a viable theory of damages. (Mot. at 24, n.13.; Reply at 11–12.) Indeed, as Blue points out, courts in other circuits have characterized the theory of deepening insolvency as controversial and puzzling. *See Fehrbach*, 493 F.3d at 908–10. Yet, these cases do not pronounce the theory universally unacceptable. *See, e.g.*, *In re Parmalat Securities Litigation*, 501 F. Supp. 2d 560, 573–78 (S.D.N.Y. 2007) (declining to rule that delayed liquidation can never be

-17-

a form of corporate harm but finding that the pleadings raised only speculation of harm). In fact, it appears that deepening insolvency may be a viable theory for damages under Ohio law. *See In re Nat'l Century Fin. Enters. Inc. Inv. Litig.*, 604 F. Supp. 2d 1128, 1153 (S.D. Ohio 2009) (finding that in Ohio, allegations of deepening insolvency "is best viewed as a measure of damages to bankrupt entities"); *cf. Cohen v. Dulay*, 94 N.E.2d 1167, 1175–76 (Ohio Ct. App. 2017) (finding the theory of deepening insolvency is not recognized as an independent cause of action, but merged the plaintiff's claims of deepening insolvency into the plaintiff's breach of fiduciary duty cause of action).

Because Plaintiff has pled factual allegations in support of each of the elements of professional malpractice, the court finds that Plaintiff has stated a plausible claim for relief. As counsel clearly understand, this order should not be read, one way or the other, as opining on the merits of the claim.

### IV. CONCLUSION

For the foregoing reasons, the court denies Defendant Blue & Co.'s Motion to Dismiss Count IX of the Complaint (ECF No. 23).

IT IS SO ORDERED.

> */s/ SOLOMON OLIVER, JR.*
> UNITED STATES DISTRICT JUDGE

February 12, 2019