UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CH LIQUIDATION ASSOCIATION LIQUIDATION TRUST, *et al.*, | ) ) ) | Case No.: 5:18 CV 752 |
| Plaintiffs | ) ) | |
| v. | ) ) | JUDGE SOLOMON OLIVER, JR. |
| GENESIS HEALTHCARE SYSTEM, *et al.*, | ) ) ) ) | |
| Defendants | ) | <u>ORDER</u> |

Currently pending before the court in the above-captioned case is Defendants Genesis Healthcare System and Matthew Perry's ("Defendants") Motion to Dismiss Counts I, II, V, VI, VII, and VIII of the Complaint (ECF No. 28). For the following reasons, the court grants the Motion in part and denies it in part.

**I. BACKGROUND**

In the aftermath of the financial collapse of Coshocton Memorial Hospital Association ("CCMH" or "Debtor"), Plaintiff CH Liquidation Association Liquidation Trust and Joseph Oriti, in his capacity as Debtor Representative and Liquidation Trustee of the estate of CCMH ("Plaintiff"), filed a Complaint seeking redress for the injuries allegedly caused by eight Defendants (ECF No. 1). Relevant to the pending Motion, Plaintiff names Genesis Healthcare System ("Genesis") for breach of contract (Count I), and breach of fiduciary duty (Count II), and Genesis and the CEO of Genesis Matthew Perry ("Perry") for violations of federal and state antitrust law under the Sherman Act and the Valentine Act (Counts V–VIII).

**A. Factual Background**

Debtor operated a general acute care not-for-profit hospital in Coshocton, Ohio, as well as a number of primary care and specialty physician clinics. (Compl. ¶15, ECF No. 1.) Genesis is an integrated health care delivery system that is located in Zanesville, Ohio, approximately thirty miles from CCMH. (*Id*. ¶¶ 17, 42.) Plaintiff states that there was overlap between Debtor and Genesis' primary service areas, and the two were considered competitors for market share in the region. (*Id*. ¶ 50.)

Perry is the current President and CEO of Genesis. (*Id.* ¶ 18.) Plaintiff states that in 2007, when Perry became CEO of Genesis, he and Genesis' chief financial officer Paul Masterson ("Masterson") developed a strategic plan for Genesis to capture and control patient market share in Genesis' service region. (*Id*. ¶ 45.) Plaintiff also maintains that Perry and Masterson knew that in order for the plan to succeed, Genesis would need to attract patients from other hospitals and health care systems. (*Id*. ¶ 49.)

As early as the fall of 2008, at a time of financial difficulty for CCMH and other rural hospitals, CCMH began a complicated relationship with Genesis. The relationship started with a representative from Genesis and a representative from CCMH, each serving as equals on a three-member not-for-profit healthcare alliance board. (*Id*. ¶¶ 57–64.) However, in May of 2012, Genesis learned that CCMH was facing severe financial difficulties. (*Id.* ¶ 82.) Shortly thereafter, Perry noted in a Genesis Executive Committee meeting that Genesis could face a loss of market share if CCMH affiliated with a competing health care system. (*Id*. ¶ 84.) Around that same time, Genesis approached then-CEO of CCMH Robert Miller ("Miller" or "former CCMH CEO") about a proposal for Genesis to manage CCMH. (*Id*. ¶¶ 90–96.) By the end of May, Perry, with Miller's assistance,

met with the full CCMH Board, and the Board agreed to move forward with developing the Management Agreement. (*Id*. ¶¶ 97, 104–105.) Genesis and CCMH executed the Management Agreement on June 18, 2012. (*Id*. ¶ 163.)

The Management Agreement tasked Genesis with improving CCMH's operational and financial performance, enhancing CCMH's quality of patient care, and increasing access to health care for the benefit of the community. (*Id*. ¶ 179.) Plaintiff states that in carrying out CCMH's goals, the Management Agreement gave Genesis full authority, power, and control to manage, administer, and operate CCMH. (*Id*. ¶ 180.) In particular, the Management Agreement gave Genesis control over CCMH's executive/operations management, financial management, strategic planning, medical staff administration, physician recruitment, facility management, most human resources, supply chain management, and management and approval of all of CCMH's hospital-based physician contracts. (*Id*. ¶¶ 181, 190–193.) The Management Agreement also gave Genesis authority to employ and oversee CCMH management personnel, such as the CEO and CFO of CCMH. (*Id*. ¶¶ 182–189.) Finally, Plaintiff maintains that Genesis further controlled CCMH through providing CCMH a $4 million loan. (*Id*. ¶¶ 313–337.)

During the period in which Genesis managed CCMH, Plaintiff alleges that Genesis, under Perry's leadership: (1) recruited, hired, and employed physicians for Genesis to the detriment of CCMH; (2) took advantage of its relationship with CCMH to increase referrals and transfers to Genesis; (3) engaged in a financial scheme that required CCMH employees to use Genesis' medical network and; (4) negotiated an agreement in bad faith that required CCMH to exclusively use Genesis' laboratory services. (*Id*. ¶¶ 226–246, 261–296, 338–334.) Plaintiff also alleges that Genesis

used its control to keep competing healthcare systems out of the market. (*Id*. ¶¶ 247–260.) Plaintiff claims that, because of these actions, Genesis failed to meet its duties and obligations in managing CCMH in good faith. (*Id*. ¶ 380.) Plaintiff also contends that Genesis failed to take appropriate action with respect to CCMH staffing and financial management. (*Id*. ¶¶ 380–420.) Thus, Plaintiff claims that CCMH deteriorated under Genesis' control. (*Id*. ¶ 6.)

In the fall of 2015, CCMH's financial situation continued to erode. (*Id*. ¶ 420.) In November of 2015, CCMH and Genesis suspended the Management Agreement and in 2016, the parties terminated the Management Agreement. (*Id*. ¶¶ 423–425.)

**B. Procedural History**

On June 30, 2016, CCMH filed its voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Ohio. (*Id*. ¶ 30.) CCMH continued to operate as debtor-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108 after the Petition Date. (*Id*. ¶¶ 30–31.) On October 3, 2016, the Bankruptcy Court entered an order approving CCMH's sale of substantially all of its assets, and the sale transaction closed on October 31, 2016. (*Id*. ¶¶ 32–33.) On July 12, 2017, the Bankruptcy Court confirmed the Chapter 11 plan (the "Plan"), and the Plan became effective on August 1, 2017. (*Id.* ¶¶ 34, 36.) Plaintiff filed the Complaint in the present action on April 3, 2018. On June 11, 2018, Defendants filed a Motion to Dismiss ("Motion") pursuant to Federal Rule of Civil Procedure 12(b)(6) and Federal Rule of Bankruptcy Procedure 7012(b) with respect to Count I (breach of contract against Genesis), Count II (breach of fiduciary duty against Genesis), Count V (violation of Sherman Act § 1 against Genesis and Perry), Count VI (violation of Sherman Act § 2 against Genesis), Count VII (attempted violation of Sherman Act §

2 against Genesis), and Count VIII (violation of Valentine Act against Genesis and Perry).[1] Plaintiff submitted a Response (ECF No. 48) on July 13, 2018, and Defendants replied (ECF No. 55) on July 27, 2018.

## II. LEGAL STANDARD

The United States Supreme Court clarified the law regarding what a plaintiff must plead in order to survive a motion made pursuant to Rule 12(b)(6) in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).When determining whether the plaintiff has stated a claim upon which relief can be granted, the court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. The plaintiff's obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. Even though a complaint need not contain "detailed" factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the Complaint are true." *Id.* A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

The Court, in *Iqbal*, further explained the "plausibility" requirement, stating that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

---

[1] Plaintiff also names Genesis and Perry with respect to Count III (breach of fiduciary duty against Perry), Count XIV (recharacterization against Genesis), Count XV (equitable subordination against Genesis), Count XVI (avoidance of preference period transfers against Genesis), Counts XVII and XVIII (avoidance of fraudulent transfers against Genesis), Count XIX (recovery of avoided transfers against Genesis), and Count XX (allowance of all claims against Genesis). However, these claims are not the subject of Defendants' pending Motion.

reasonable inference that the defendant is liable for the misconduct alleged." 556 U.S. at 678. Furthermore, "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* This determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

### III. LAW AND ANALYSIS
#### A. Breach of Contract as to Genesis (Count I)

Plaintiff alleges that Genesis breached the Management Agreement because Genesis managed CCMH for Genesis' own benefit, rather than in CCMH's interest to survive as a stand-alone hospital. (Compl. ¶ 442.) In particular, Plaintiff claims that Genesis breached Sections 1.3, 1.3(b), 1.3, 1.4, 3.3.4, and 6.1 of the Management Agreement because, among other things, Genesis failed to perform its obligations as a manager in good faith, operate CCMH on a financially prudent basis, exercise reasonable efforts to ensure that CCMH maintained a medical staff qualified to meet patient needs, allow the CCMH Board to exercise proper control, maintain a process by which managed care contract information was not shared between CCMH and Genesis, and ensure the confidentiality of CCMH's proprietary information. (*Id.* ¶¶ 443–448.)

Defendants argue that Plaintiff's claim should be dismissed because CCMH failed to provide notice of a breach within ten days of the breach, in accordance with § 9.8 of the Management Agreement ("Notice Provision"). (Mot. 6–7, ECF No. 28.) Section 9.8 of the Management Agreement reads:

> Any claim or cause of action against Manager [Genesis] for breach or non-performance under this Agreement shall be presented to Manager in writing within

> ten (10) days from the date of the breach or non-performance, or shall be forever waived. Otherwise the failure of any Party to exercise any right or enforce any remedy contained in this Agreement shall not operate as or be construed to be a waiver or relinquishment of the exercise of such right or remedy, or of any other right or remedy herein contained.

(Opp'n 16, ECF No. 48.) According to Defendants, Plaintiff never provided notice of breach of contract and, therefore, Plaintiff waived this claim. (Mot. at 7–8.).

Plaintiff, on the other hand, contends that the provision should not be enforced because it is ambiguous. Plaintiff does not dispute Defendants' interpretation of the first sentence of the provision to require notice of a breach to Genesis within ten days or else Plaintiff forfeits the claim. However, Plaintiff interprets the second sentence to state that failure to exercise any right shall not operate as a waiver of such right. (Opp'n at 16–17.) Accordingly, Plaintiff argues that the sentences are contradictory, and further discovery is required to understand the parties' intent in drafting this section. (*Id*. at 17.)

The court finds that the two sentences can be read together. Because the two are not in conflict, the section is not ambiguous. *See United States v. Donovan*, 348 F.3d 509, 512 (6th Cir. 2003) (noting that where there is no ambiguity in contractual language, the court should determine the parties' intent from the plain language of the contract rather than through extrinsic evidence). Parties do not dispute that the first sentence plainly requires Plaintiff to notify Genesis of a breach of contract claim within ten days of the breach. The second sentence can be construed to supplement the first sentence. For instance, the second sentence can be read to preserve CCMH's future breach of conflict claims. Thus, even if CCMH failed to notify Genesis of a breach of contract claim in the first instance, the second sentence provides that CCMH's failure to exercise its right to notify Genesis and bring the claim in the first instance does not preclude it from bringing a future claim should another breach occur. The court is not called upon to determine the precise meaning of the

second sentence in the disputed provision, but by way of the example provided, the court finds that the two sentences can be read compatibly. Because there is no inherent conflict between the two sentences, the court finds that the plain meaning of the first sentence applies. Therefore, CCMH was required to give notice of a breach of contract pursuant to the first sentence of § 9.8 of the Management Agreement. *See also Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.*, 210 F.3d 672, 684 (6th Cir. 2000) ("If a contract is clear and unambiguous . . . there is no issue of fact to be determined.").

However, Plaintiff also contends that the Notice Provision is unconscionable. (*Id.* at 19.) A provision of a contract is unconscionable where there is "(1) substantive unconscionability, i.e. unfair and unreasonable contract terms, and (2) procedural unconscionability, i.e., individualized circumstances surrounding each of the parties to a contract such that no voluntary meeting of the minds was possible." *Garrett v. Hooters-Toledo*, 295 F. Supp. 2d 774, 779 (N.D. Ohio 2003). A determination of substantive unconscionbility involves "consideration of the terms of the agreement and whether they are commercially reasonable." *Hayes v. Oakridge Home,* 908 N.E.2d 408, 414 (Ohio 2009). Procedural unconscionability involves the court's assessment of each party's bargaining power, and whether there was such a severe imbalance that a party was not able to meaningfully assess the contract or assert their rights in contract negotiations. *Garrett*, 295 F. Supp. 2d at 779; *Christ Holdings, L.L.C. v. Schleappi*, 67 N.E.3d 47, 54 (Ohio Ct. App. 7th Dist. 2016) (noting that in regard to procedural unconscionability, "[c]ourts consider each party's age, education, intelligence, business acumen and experience, who drafted the contract, and whether alterations in the printed terms were possible.").

Plaintiff argues that the provision is substantively unreasonable because the conflicts of interest of both CCMH's key personnel and the CCMH Board precluded a breach of contract claim

-8-

from being raised. (Opp'n at 18.) However, Plaintiff's assertion is irrelevant to whether the Notice Provision is commercially reasonable. *See Hayes*, 908 N.E.2d at 408 (Ohio 2009). In fact, courts routinely enforce provisions that require a party to provide notice to the other party of a breach of contract even in the absence of conflict of interest issues. *See, e.g.*, *Moraine Materials Co. v. Cardinal Operating Co.*, No. CA 16782, 1998 WL 785363, at *4–5 (Ohio Ct. Appl. 1998) (upholding a 10-day written notice provision for breach of contract); *see also Au Rustproofing Ctr., Inc. v. Gulf Oil Corp.*, 755 F.2d 1231, 1237 (6th Cir. 1985) (enforcing a notice provision because "[a] right of action requiring notice as a condition precedent cannot be enforced unless the notice provided for has been given.").

Plaintiff also fails to show procedural unconscionability. Both Genesis and CCMH are sophisticated business entities and both were represented by counsel. *See Airlink Comms., Inc. v. Owl Wireless, LLC*, No. 3:10 CV 2296, 2011 WL 4376123, at *4 (N.D. Ohio Sept. 20, 2011) (declining to find procedural unconscionability where both parties are sophisicated business entities that were represented by counsel). However, Plaintiff argues that there was a disparity in bargaining power because the Management Agreement was negotiated in bad faith by parties with conflicted interests, such as former CCMH CEO Miller, who was employed by Genesis following the execution of the Management Agreement. (Opp'n at 19.) However, Plaintiff's argument rests on unsupported assumptions, including that Genesis' alleged influence was so overpowering that no other CCMH Board member or key personnel at CCMH could have acted adversely to Genesis' interests. Thus, Plaintiff has not alleged plausible allegations that CCMH and CCMH's Board, who ultimately voted to approve the Management Agreement, was at such a disadvantage in these negotiations that "no voluntary meeting of the minds was possible." *Garrett*, 295 F. Supp. 2d at 779. Accordingly, Plaintiff has not shown that the Notice Provision is unconscionable.

In any case, Plaintiff also argues that CCMH provided Genesis adequate notice through the agreement to terminate Genesis' management of CCMH ("Termination Agreement").[2] (Opp'n at 20.) But even if Genesis' breaches were cumulative and continuous as Plaintiff asserts, CCMH and Genesis suspended their contract in November of 2015. (Compl. ¶ 423.) The Termination Agreement was not executed until June 2016. (*Id*. ¶ 424.) Thus, CCMH still failed to give notice within the ten days required by § 9.8 of the Management Agreement.

For the foregoing reasons, Plaintiff has not alleged plausible factual allegations to support the non-enforcement of the Notice Provision on grounds of ambiguity or unconscionability. Accordingly, the court finds the provision to be applicable to Plaintiff's breach of contract claim. *Salazar v. Progressive N. Ins. Co.*, No. 1:13 CV 2653, 2014 WL 12596528, at *2–4 (N.D. Ohio Sept. 30, 2014) (enforcing a valid condition precedent in a contract and dismissing the plaintiff's claim for failure to satisfy that condition precedent). Because CCMH failed to give notice as required by the Management Agreement, the court dismisses Plaintiff's breach of contract claim against Genesis.

### B. Breach of Fiduciary Duty as to Genesis (Count II)

To maintain a claim for breach of fiduciary duty, the plaintiff must prove the existence of a duty arising from a fiduciary relationship, the defendant's failure to carry out the duty, and an injury that resulted proximately from the defendant's failure to observe the duty. *Puhl v. U.S. Bank, N.A.*, 34 N.E.3d 530, 536 (Ohio Ct. App. 12th Dist. 2015). In Ohio, a fiduciary relationship is defined as one "in which special confidence and trust is reposed in the integrity and fidelity of

---

[2] Clause B of the Termination Agreement reads: "Each party reserves all of its rights, remedies, claims, defenses and affirmative defenses arising under, related to, or subject to the provisions of section 9.8 of the Management Agreement. Nothing in this Agreement shall be deemed to affect either Party's rights related to Section 9.8 in any way." (Opp'n at 20.)

another and there is a resulting position of superiority of influence, acquired by virtue of this special trust." *Hope Acad. Broadway Campus v. White Hat Mgmt., L.L.C.*, 46 N.E.3d 665, 676 (Ohio 2015). To determine the existence of a fiduciary relationship between two parties, courts must consider "whether a party agreed to act primarily for the benefit of another in matters connected with its undertaking." *Id*. Furthermore, the "parties' characterization of their relationship in the contracts is not controlling." *Id.* at 675–76. Courts must look to the parties' actions to determine if a duty exists. *See N & G Constr., Inc., v. Lindley*, 56 Ohio St. 2d 415, 417 n.1 (1978) ("[A] description by the parties of their future relationship is not necessarily determinative when viewed in light of their actual subsequent activities."). Consequently, "there is generally no fiduciary relationship between an independent contractor and his employer unless both parties understand that the relationship is one of special trust and confidence." *Daly v. New York Life Ins. Co.*, No. 1:12CV125, 2017 WL 4349032, at *5 (S.D. Ohio Sept. 30, 2017) (quoting *Schulman v. Wolske & Blue Co.*, *L.P.A.*, 708 N.E.2d 753, 758 (Ohio Ct. App. 1998)). Finally, whether a fiduciary relationship exists is a question of fact dependent upon the circumstances in each case. *Id*.

Genesis asserts that it did not enter into a fiduciary relationship with CCMH because the Management Agreement expressly provides that Genesis was to act and perform as an independent contractor. (Mot. at 8.) Genesis further maintains that a fiduciary relationship requires one party to "act primarily for the benefit of another," but its independent contractor status and the Management Agreement's express statements that Genesis and CCMH were not to be considered joint entities is further evidence that Genesis never intended to subvert its own interests to that of CCMH's. (Mot. at 8–9; Reply at 13.) However, Plaintiff has pled sufficient factual allegations to show that Genesis and CCMH entered into a fiduciary relationship.

In a similar case, the Ohio Supreme Court found that a company who was authorized to "operate 'all functions' of [the schools'] day-to-day operations" and "act in key matters on behalf of the schools" owed a fiduciary duty to a group of charter schools even though the company's contract stated that the company was an independent contractor. *Hope Acad. Broadway Campus*, 46 N.E.3d at 676. Based on these activities, the Ohio Supreme Court determined that it was "evident that the schools have granted broad discretion to [the company], placing special confidence and trust in the management companies and placing them in positions of superiority and influence." *Id*. In this case, Plaintiff points to provisions of the Management Agreement authorizing Genesis to oversee the administration of CCMH and its day-to-day operations as evidence that CCMH placed its "trust and confidence" in Genesis. *Hope Acad. Broadway Campus*, 46 N.E.3d at 676. Furthermore, Plaintiff's Complaint cites to several instances in which Genesis exclusively managed key areas of CCMH's administration, such as physician recruitment and healthcare plans for CCMH employees. (Compl. ¶¶ 226–246, 281–296.) Thus, despite Genesis' contractual status as an independent contractor of CCMH, its actions, both agreed to in the contract and as executed, are "hallmarks of a fiduciary relationship." *Hope Acad. Broadway Campus*, 46 N.E.3d at 675–76.

In addition, Genesis' independent status and its actions in carrying out its own interests need not be mutually exclusive of a commitment to act for CCMH's benefit, as a fiduciary relationship requires. For instance, the court could infer that Genesis entered into the Management Agreement in the best interest of both Genesis and CCMH in continuing to provide medical services to those in their common primary service area. (Compl. ¶¶ 48, 51–52, 84.) Accordingly, Plaintiff has sufficiently pled factual allegations to support that a fiduciary relationship could have plausibly existed between Genesis and CCMH, such that Genesis owed a fiduciary duty to CCMH.

In addition, Genesis maintains that Plaintiff cannot proceed on its breach of fiduciary duty claim because it is duplicative of Plaintiff's breach of contract claim. (Mot. at 9.) Plaintiff contends that its breach of fiduciary duty claim is distinct from its breach of contract claim because it is a claim based in tort. (Opp'n at 26.) In Ohio, "[a] claim of breach of a fiduciary duty is basically a claim of negligence, albeit involving a higher standard of care. *Strock v. Pressnell*, 527 N.E.2d 1235, 1243 (Ohio 1988). To have a cognizable tort claim, the plaintiff must "allege a breach of some positive legal duty imposed by law because of the relationship of the parties, rather than from a mere omission to perform a contract obligation." *Academic Imaging, LLC v. Soterion Corp*, 352 F. App'x 59, 64–65 (6th Cir. 2009). In other words, when a duty is imposed by a contract, the tort claim fails. *See, e.g.*, *Infocision Mgmt. Corp. v. Found. for Moral Law, Inc.*, No. 5:09 CV 951, 2009 WL 2781749, at *5 (N.D. Ohio Aug. 28, 2009); *K & D Farms, Ltd. v. Enervest Operating, L.L.C.*, No. 2015CA00038, 2015 WL 6507785, at *8 (Ohio Ct. App. 5th Dist. 2015).

As the court has already determined above, Plaintiff has established a plausible claim that a fiduciary relationship exists even though the duty, as Defendants argue themselves, is not expressly addressed in the Management Agreement. However, Genesis argues that Plaintiff's alleged damages are the same as those that arise from the breach of contract claim. (Mot. at 10.) Genesis asserts that this is evidence that Plaintiff's breach of fiduciary claim cannot be made independent of Plaintiff's breach of contract claim. In addition, Genesis contends that Plaintiff plainly references portions of the Management Agreement in arguing that Genesis has a fiduciary duty and Genesis breached that duty. (Reply at 14.) Genesis maintains that Plaintiff's reliance on the Management Agreement also shows that the fiduciary duty claim is based on the contract.

However, Genesis mischaracterizes Plaintiff's assertions. Although Plaintiff refers to the Management Agreement, Plaintiff does so only insofar as to show that there is factual support for

its claim that Genesis had a fiduciary duty. While Plaintiff alleges the same injuries here as it did under its breach of contract claim, the source of the injury in its breach of fiduciary claim is distinct from that of its breach of contract claim. In other words, Genesis' fiduciary duty does not arise from a contract. Accordingly, the court finds that Plaintiff has provided sufficient support that its breach of fiduciary duty claim could be maintained separate from its breach of contract claim. Thus, Plaintiff's breach of fiduciary claim survives Defendants' Motion to Dismiss.

**C. Violations of Federal and State Antitrust Laws as to Genesis and Perry (Counts V–VIII)**

Plaintiff alleges that Genesis and Perry violated Section 1 of the Sherman Act, 15 U.S.C. § 1 (Count V) and the Valentine Act, Ohio Rev. Code § 1331.01 *et seq*. (Count VIII). Plaintiff also claims that Genesis violated and attempted to violate Section 2 of the Sherman Act, 15 U.S.C. § 2 (Counts VI, VII).

The parties do not dispute that the Valentine Act is interpreted in the same manner as the Sherman Act, its federal counterpart. *Johnson v. Microsoft Corp.*, 834 N.E.2d 791, 795 (Ohio 2005). Thus, Plaintiff's Valentine Act claim rises and falls with its Sherman Act claims. *See Nilavar v. Mercy Health Sys. W. Ohio*, 494 F. Supp. 2d 604, 621 (S.D. Ohio 2005) (granting summary judgment to the defendants on a Valentine Act claim based on a grant of summary judgment to the defendants on a Sherman Act claim); *Richter Concrete Corp. v. Hilltop Basic Res., Inc.*, 547 F. Supp. 893, 920 (S.D. Ohio 1981) (finding that a failure to prove claims under the Sherman Act constitutes a failure to prove the claim under the Valentine Act). However, the parties disagree on the issue of whether Plaintiff has standing to bring claims under antitrust law.

Antitrust standing and Article III standing are not one and the same. *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 449 (6th Cir. 2007). Antitrust standing requires a different analysis because antitrust

laws were "enacted for the protection of competition, not competitors." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977). The test for antitrust standing consists of five factors: (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation. *Defiance Hosp. v. Fauster-Cameron, Inc.*, 344 F. Supp. 2d 1097, 1106 (N.D. Ohio 2004) (quoting *Southhaven Land Co., Inc. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1085 (6th Cir. 1983)).

Of particular relevance to Defendants' Motion are the first two factors which require that "for an antitrust plaintiff to have antitrust standing, he or she must have suffered an antitrust injury." *MacNealy v. Dayton Osteopathic Hosp. Inc.*, No. C-3-88-402, 1993 WL 1377513, at *6 (S.D. Ohio Mar. 3, 1993). As the United States Supreme Court has instructed, antitrust injury "should reflect the anticompetitive effect either of the violation or of the anticompetitive acts made possible by the violation." *Brunswick Corp.*, 429 U.S. at 489. In order to show an antitrust injury, the plaintiff's injury must be aligned with that of consumers. *See Tri-Gen, Inc. v. Int'l Union of Operating Engineers, Local 150, AFL-CIO,* 433 F.3d 1024, 1031 (7th Cir. 2006) ("[A] plaintiff must demonstrate consumer injury to have standing to assert antitrust violations."). In addition, it is generally difficult for a plaintiff-competitor to show that it has antitrust standing because it typically "gains from higher prices and loses from lower prices—just the opposite of the consumer interest." *MacNealy v. Dayton Osteopathic Hosp. Inc.*, No. C-3-88-402, 1993 WL 1377513, at *8 (S.D. Ohio Mar. 3, 1993); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 583 (1986)

(noting that when the parties are competitors, both parties stand to gain from any conspiracy to raise the market price, and thus, one party cannot recover for a conspiracy to impose restraints that have the effect of either raising market price or limiting output).

Plaintiff asserts that it suffered an antitrust injury when Genesis controlled and limited physician recruitment, and, thus, increased the prices for medical services in the region which Genesis and CCMH both served. (Opp'n at 29; Compl. ¶¶ 481, 506.) Plaintiff states that Genesis would make hiring and recruitment decisions at CCMH for Genesis' own benefit. For example, Plaintiff states that Genesis would pursue physician candidates first and place candidates at CCMH only if they were not suitable for Genesis. (Compl. ¶¶ 228, 233.) Furthermore, Plaintiff maintains that because CCMH was precluded from any recruitment decisions, it was not able to set physician compensation rates. (Compl. ¶¶ 229, 235, 236.) Genesis, on the other hand, was able to set higher salaries for potential candidates and entice physicians to work at Genesis rather than CCMH. (*Id.*) Therefore, Plaintiff claims that Genesis lowered competition because CCMH was not able to adequately hire physicians to compete with Genesis' physicians. (Opp'n at 29–30; Compl. ¶ 229.) Thus, Plaintiff alleges that Genesis' actions "reduced output" and increased the prices for medical services in the region. Presumably, Plaintiff is arguing that as a result of the physician hiring restrictions that Genesis imposed on CCMH which "reduced output" of physicians in the region, CCMH was unable to compete in the market.

The court finds that Plaintiff does not have standing to pursue its antitrust claims. First, Plaintiff has not plausibly alleged that "the nature of the plaintiff's alleged injury" is one that the antitrust laws were intended to protect. *Southaven Land Co., Inc. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1085 (6th Cir. 1983). Although Plaintiff alleges that Genesis reduced the availability of physicians, Genesis only reduced the number of physicians available to CCMH. Plaintiff does not

allege that Genesis reduced the total number of physicians in the market. Thus, Plaintiff's output-restriction allegation fundamentally differs from that of other antitrust cases where the claimed reduction in output *marketwide* leads to higher prices for consumers. *See, e.g.*, *Defiance Hosp. v. Fauster-Cameron, Inc.*, 344 F. Supp. 2d 1097, 1108 (N.D. Ohio 2004) (finding that a hospital had antitrust standing to sue an anesthetic services provider who controlled the market in anesthetic services and refused its services to the hospital unless it signed certain exclusivity agreements). Even if CCMH suffered an injury as a result of Genesis' restrictions on CCMH's physician recruitment, Plaintiff has not alleged that such injury was equally suffered by consumers because there were fewer physicians available in the market to consumers.

Second, Plaintiff does not allege a plausible "causal connection between the antitrust violation," *Southhaven Land Co., Inc.*, 715 F.2d at 1085, and the increased medical services costs to consumers, which CCMH claims caused CCMH to be "squeezed out of the Coshocton market." (Opp'n at 31.) Accepting Plaintiff's allegations that Genesis monopolized physician recruitment in the region as true, it is plausible that consumers could have suffered increased market prices for medical services as a result. *Nelson v. Monroe Regional Med.* Center, 925 F.2d 1555, 1566–67 (7th Cir. 1991) (discussing how the anti-competitive effects of a clinic's merger with a medical center could lead to "decreased output, and increased prices"). But it does not follow that CCMH would have necessarily suffered from an increase in medical prices in the region. In fact, CCMH would have benefitted from a rise in prices that it could charge for medical services, whether or not it was a knowing or willing participant in the alleged Genesis scheme. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 582–83 (1986). To the extent that Plaintiff alleges that it was driven out of the market by Genesis, Plaintiff has not sufficiently pled facts that this was caused by

an increase in the medical services prices, and not, instead, by other alleged acts in Plaintiff's Complaint.

Therefore, Plaintiff does not have standing to pursue its Sherman Act claims and these claims are dismissed. Accordingly, the court also dismisses Plaintiff's Valentine Act claims.

## IV. CONCLUSION

For the foregoing reasons, the court grants Defendants' Motion to Dismiss (ECF No. 28) as to Counts I, VI, and VII against Defendant Genesis Healthcare Systems, and Counts V and VIII against Defendants Genesis Healthcare Systems and Matthew Perry. The court denies Defendants' Motion as to Count II against Defendant Genesis Healthcare Systems.

IT IS SO ORDERED.

*/s/ SOLOMON OLIVER, JR.*
UNITED STATES DISTRICT JUDGE

March 21, 2019